[No. F006510. Fifth Dist. Jan. 21, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LEE MORD, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

1094

COUNSEL

Mark L. Christiansen and Frank O. Bell, Jr., State Public Defender, under appointments by the Court of Appeal, and Richard L. Phillips, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane N. Kirkland, Edmund D. McMurray and Jane L. Lamborn, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PETTITT, J.*—On March 6, 1979, appellant, Gary Mord, was arrested for the shooting death of his father.

On April 7, 1979, appellant was admitted to the Atascadero State Hospital for proceedings pursuant to Penal Code[1] section 1368 (competency proceedings).

On November 30, 1979, appellant was certified competent to stand trial.

On January 23, 1980, an information was filed in the Superior Court of Merced County charging appellant with murder in violation of section 189.

On March 17, 1980, appellant waived his right to a jury trial, and the matter was submitted to the court on the preliminary hearing transcript and doctor's reports along with the agreement that the finding could be no greater than involuntary manslaughter.

On March 21, 1980, the court found appellant guilty of involuntary manslaughter in violation of section 192.2 and also found him not guilty by reason of insanity.

On March 24, 1980, appellant was committed to Atascadero State Hospital pursuant to section 1026, for a maximum of four years. Appellant was given 386 days of custody credits.

Appellant filed an appeal, and while the appeal was pending a jury determined appellant had not recovered his sanity. On appeal the judgment of the trial court was affirmed, and the Merced County Superior Court filed the remittitur on December 24, 1981.

On August 5, 1982, appellant was ordered to be placed with the Merced County Department of Mental Health in a local locked facility, Merced Manor, for 60 days.

On October 7, 1982, appellant was granted a leave of absence on parole to community outpatient treatment pursuant to section 1611, which has since been repealed. The court approved the treatment plan for appellant at the Frontier Halfway House Program, and he was committed to the custody of the Merced County Department of Mental Health for this placement.

---

\* Retired judge of the superior court sitting under assignment of the Chairperson of the Judicial Council.

[1] Hereinafter, unless otherwise stated, all statutory references are to the Penal Code.

On September 8, 1983, Dr. A. J. Rucci, the Medical Director of Atascadero State Hospital, submitted a recommendation that appellant's outpatient status be renewed pursuant to section 1611, subdivision (a).

On September 17, 1984, Gordon Migliore, a clinical social worker at Atascadero State Hospital, submitted a recommendation that appellant's outpatient status be renewed pursuant to section 1611, subdivision (a).

No hearings were held after receipt of these recommendations in 1983 and 1984.

On June 26, 1985, appellant was ordered transferred back to Atascadero State Hospital pending the determination of a request for parole revocation, pursuant to section 1611.

On June 27, 1985, David Jones, Psychiatric and Forensic Coordinator of the Merced County Mental Health Services and appellant's case supervisor, requested that appellant's parole be revoked.

On June 28, 1985, Gordon Migliore, on behalf of himself and Gordon W. Gritter, medical director, informed the court that the Atascadero State Hospital staff concurred with the recommendation that appellant's parole be revoked.

On or about July 1, 1985, appellant was placed in custody, and he was returned to Atascadero State Hospital on July 8, 1985.

No hearing was held before the court revoked appellant's parole.

On July 16, 1985, David Jones wrote to the court recommending that appellant's commitment be extended pursuant to section 1026.5, subdivision (b).

On August 8, 1985, the Merced County District Attorney filed a petition in the Merced County Superior Court alleging that appellant represented a substantial danger of harm to others and asked the court to begin extension proceedings pursuant to section 1026.5, subdivision (b).

On September 6, 1985, appellant filed a motion to dismiss the extension petition, claiming he was due precommitment conduct credits for time he spent in jail and if granted those credits the petition would be rendered untimely. Appellant also based this motion on noncompliance with the outpatient parole extension hearing requirements of section 1611, subdivision (a).

On September 17, 1985, the court denied appellant's request for the precommitment conduct credit. The same day two psychiatrists were appointed to examine appellant and, pursuant to appellant's request, the matter was set for jury trial.

On September 27, 1985, the court denied appellant's motion to dismiss the extension petition.

On November 21, 1985, a jury trial began, and on November 22, 1985, the jury returned its verdict finding that appellant had a mental disease, defect, or disorder, and that by reason of such mental condition he represented a substantial danger of physical harm to others.

On November 26, 1985, appellant filed "Post Trial Points and Authorities," claiming that he was due precommitment conduct credits for the time he spent in the state hospital and if granted those credits the petition would be rendered untimely.

On December 9, 1985, the court denied appellant's motion for conduct credit for time spent in the state hospital. The court also found that an extended commitment was warranted, and ordered that appellant be returned to Atascadero State Hospital.

On December 10, 1985, appellant filed a timely notice of appeal.

On December 16, 1985, the court filed its order that appellant be returned to Atascadero State Hospital for an additional two-year period of confinement dating from December 1, 1985.

## FACTS

It is uncontradicted that appellant suffers from chronic paranoid schizophrenia, a disorder that affects and interferes with one's contact with reality, logical thinking, and emotional processes. It was this illness that led to the finding that appellant was not guilty by reason of insanity for the shooting death of his father in 1979.

After this finding, appellant was committed to Atascadero State Hospital and was treated there until August 1982 when he was placed in Merced Manor, a local locked facility. Two months later appellant was released on outpatient parole status, spending approximately the first six months at the Frontier Halfway House before moving to an independent apartment complex. At this time things went well for appellant. He attended school, church, became involved in church activities, and obtained a job. However,

the auditory hallucinations, or "voices," that had plagued appellant since a young age began plaguing appellant again in the spring of 1985, and became a factor in the difficulties he began experiencing.

According to David Jones, the Merced County Mental Health Psychiatric and Forensic Coordinator and appellant's parole officer or "case supervisor" since 1984, in the spring of 1985 appellant began to experience considerably more stress. Much of this stress was brought on by the voices, which earlier had caused him to quit school and cease work, but much of it was caused by rumors in the apartment complex that appellant's earlier commitment to Atascadero had been for child molestation.

On June 17, 1985, appellant was involved in his second altercation at the apartment complex. Appellant contacted Mr. Jones, and expressed fear not only over what might happen to him, but fear that he might hurt someone else. At this time appellant agreed to a 72-hour hold in a psychiatric unit pursuant to Welfare and Institutions Code section 5150. At the end of this period appellant had improved, so it was decided to relocate him near his family in Stanislaus County.

Sometime shortly thereafter, appellant, Mr. Jones, and a third man commenced moving appellant's possessions to his sister's home in Modesto. Appellant placed a few items in the trunk of his car, but told the others not to place any items there because of a problem with the hinges. The men used a county pickup truck to move the rest of appellant's things. After reaching the home of appellant's sister, Elena Mord, his personal belongings were unpacked. Appellant gave Elena and her roommate, John McMullen, permission to use his car, but told them not to enter the trunk because of the problem with the jammed hinges. The next day Mr. McMullen experienced a flat tire while driving appellant's car. When he entered the trunk to get the jack, he found not only jammed hinges but a shotgun wrapped in a blanket under the spare tire as well as a knife and box of shells. In the glove compartment, Mr. McMullen found four more shells. Appellant was prohibited from possessing weapons, as the contracts he signed upon parole release acknowledge. Mr. Frank Huble, appellant's original case supervisor, stated that more than once he had discussed this prohibition with appellant.

After Mr. McMullen's discovery, Miss Mord reported it to the mental health authorities because she knew her brother was not supposed to be in possession of weapons. She then received a call from appellant, who wanted to know why she did not speak with him before contacting the authorities. Because she did not contact him first, appellant told Miss Mord that he was going to be compelled to disparage her character in court by relating childhood incidents. According to Miss Mord, she was frightened of appellant

because she felt she could no longer trust him. It was also her belief that he was again recording the voices on radio and television that "were talking about him." She also stated her belief that "he was hallucinating as bad as he was just before my father was killed."

Appellant was taken into local custody on or about July 1, 1985, and remained there until he was returned to Atascadero on July 8, 1985. On June 26, 1985, the court had issued an order that appellant be transferred back to Atascadero State Hospital pending determination of a request for parole revocation. As stated above, on June 27, Mr. Jones wrote the court requesting appellant's parole be revoked, and on June 28, 1985, Mr. Gordon Gritter, Medical Director of Atascadero State Hospital, wrote the court, through Gordon A. Migliore, a clinical social worker, to concur with Mr. Jones's request. On July 16, 1985, Mr. Jones again wrote the court, this time recommending that appellant's term be extended pursuant to section 1026.5, subdivision (b). On August 8, 1985, the district attorney filed a petition pursuant to that section to begin the proceedings to extend appellant's term. This jury trial began on November 21, 1985.

At trial, five experts testified that by reason of appellant's schizophrenia they believed him to represent a substantial danger of harm to others. In forming that opinion, each expert related the factors he relied upon.

These included appellant's recent behavior in the community, including his "secretiveness in obtaining the shotgun," his high level of paranoia and his long past history. One court-appointed psychiatrist based his opinion on what appellant told him about the past, including "a problem of armed robbery at age 18," a "DUI [driving under the influence] about that time," and hallucinations that began at age 5. This psychiatrist also related that on the night before he was to interview appellant, September 26, 1985, appellant was involved in an altercation in the jail. In this altercation, appellant struck an officer and had to be subdued with mace. According to the psychiatrist, "[t]his gave me an idea that he could be violent if it so—if he so desired." This doctor also was concerned that appellant was not able to give a satisfactory reason for his acquisition of the weapons.

Dr. Richard Lloyd was the second court-appointed psychiatrist who examined appellant. This was Dr. Lloyd's third separate evaluation of appellant since 1979. Dr. Lloyd based his opinion of appellant's dangerousness on a number of factors: (1) appellant's condition is chronic and not curable; (2) appellant has false beliefs that people are persecuting him; (3) even at his best and with medication appellant hears voices and has delusions; (4) appellant has a history of aggressive and belligerent behavior when his psychotic disorder is out of control; (5) appellant had no insight or

understanding into the fact that his acquisition of the weapons was inappropriate. Dr. Lloyd was also concerned about the altercation at the jail and stated: "The mental disorder that causes him to act in this way is still present, he still has delusional thinking. He still hears the voices. It may be very well controlled most of the time. He may look pretty good, he can cover it up and deny he's hearing voices right now, or can deny he sees things in that way. And yet the problem is still there under the surface. And I'm convinced that because of that he still represents a danger to others."

On appeal appellant raises three primary issues and many issues subsidiary to the first of those. He contends the court had no jurisdiction to extend his hospital term pursuant to section 1026.5, that the court failed to properly instruct the jury on circumstantial evidence and that failure, as well as the giving of BAJI No. 2.04, is reversible error.

PART I

*The Trial Court Did Have Jurisdiction to Extend Appellant's Term Pursuant to Section 1026.5, Subdivision (b)*

Section 1026, subdivision (a), provides in pertinent part that when a defendant is found to have been insane at the time the offense was committed "the court . . . shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility . . . ." Pursuant to section 1026.5, subdivision (a)(1), a section 1026 committee cannot be kept in actual custody longer than "the longest term of imprisonment which could have been imposed for the offense," except as set forth in section 1026.5, subdivision (b).

■ Appellant's first claim of error is that the recommitment order pursuant to section 1026.5, which extended his term, was improperly issued. Essentially, appellant alleges that many errors were committed with respect to the procedural requirements for extending a term pursuant to section 1026.5, subdivision (b), and therefore, "the trial court lacked 'jurisdiction' in the sense of power to act as it did." We will examine each alleged procedural infirmity and discuss whether error was committed, and, if so, whether it should have deprived the lower court of power to extend appellant's term.

### 1. *Timeliness of the Recommitment Petition.*

The first procedural infirmity appellant alleges centers around the language of section 1026.5, subdivision (b)(2),[2] that provides the prosecutor must file a petition to extend a commitment no later than 90 days before the expiration of the original term. Appellant acknowledges that this requirement was seemingly complied with in the instant case as the petition was filed on August 8, 1985, and appellant's commitment was not set to expire until December 1, 1985. However, appellant makes a very complicated and complex argument that he was erroneously denied certain custody and conduct credits which, had they been granted, would have lessened his maximum term of commitment and rendered the filing of the petition on August 8, 1985, untimely. It appears he is making five different claims for credit.

### (a) *Precommitment Conduct Credit.*

The maximum term of confinement of a person committed to a state hospital under section 1026.5 is computed as follows: "In the case of any person committed to a state hospital or other treatment facility pursuant to Section 1026 or placed on outpatient status pursuant to Section 1604, who committed a felony on or after July 1, 1977, the court shall state in the commitment order the maximum term of commitment, and the person may not be kept in actual custody longer than the maximum term of commitment, except as provided in this section. For the purposes of this section, 'maximum term of commitment' shall mean the longest term of imprisonment which could have been imposed for the offense or offenses of which

---

[2] This is the pertinent language of section 1026.5, subdivision (b) that governs disposition of this case. The statute was amended in 1985. (Stats. 1985, ch. 1232, § 3.5, urgency, eff. Sept. 30, 1985.) The former language provided that: "(2) Not later than 180 days prior to the termination of the maximum term of commitment prescribed in subdivision (a), the medical director of a state hospital or other treatment facility shall submit to the prosecuting attorney his or her opinion as to whether or not the patient is a person described in paragraph (1). If requested by the prosecuting attorney, the opinion shall be accompanied by supporting evaluations and relevant hospital records. The prosecuting attorney may then file a petition for extended commitment in the superior court which issued the original commitment. Such petition shall be filed no later than 90 days before the expiration of the original commitment unless good cause is shown. Such petition shall state the reasons for the extended commitment, with accompanying affidavits specifying the factual basis for believing that the person meets each of the requirements set forth in paragraph (1).

"(3) When such a petition is filed, the court shall advise the person named in the petition of the right to be represented by an attorney and of the right to a jury trial. The rules of discovery in criminal cases shall apply.

"(4) The court shall conduct a hearing on the petition for extended commitment. The trial shall be by jury unless waived by both the person and the prosecuting attorney. The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless such time is waived by the person or unless good cause is shown."

the person was convicted, including the upper term of the base offense and any additional terms for enhancements and consecutive sentences which could have been imposed less any applicable credits as defined by Section 2900.5, and disregarding any credits which could have been earned pursuant to Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3." (§ 1026.5, subd. (a)(1).) Under this statutory scheme, it is clear a section 1026 committee is due custody credit for time spent in custody prior to commitment. (§ 2900.5.) Appellant was properly awarded this credit, as the record reflects he was given credit for the 386 days he spent in jail and at Atascadero, dating from his arrest on March 6, 1979, to his ultimate section 1026 commitment on March 27, 1980. Appellant, however, asserts that he is also due *conduct* credit for this period, both for the 150 days he spent in jail and the 236 days he spent at Atascadero. Appellant ignores the fact that the statute specifically denies precommitment conduct credits.

Also, as respondent correctly argues and the trial court properly held, this court in *People* v. *Smith* (1981) 120 Cal.App.3d 817, 826 [175 Cal.Rptr. 54], rejected the argument that a defendant found insane pursuant to section 1026 is due precommitment conduct credits for the time spent in jail.

Therefore, the trial court in the present case properly denied appellant precommitment conduct credits for the time he spent in jail.

Similarly, the trial court properly denied appellant conduct credits for precommitment time appellant spent at Atascadero. It is well established that there is no equal protection violation when conduct credits are denied to those confined for treatment purposes, yet granted to those confined in jail, which is for punishment. (*People* v. *Saffell* (1979) 25 Cal.3d 223, 234-235 [157 Cal.Rptr. 897, 599 P.2d 92].) And, it is equally well established that: "Confinement of a person found to be insane and sentenced under section 1026 of the Penal Code is for care and treatment, not punishment." (*People* v. *Bodis* (1985) 174 Cal.App.3d 435, 437 [220 Cal.Rptr. 57].) The trial court's decision is also buttressed by a recent Supreme Court holding: "Because pretrial confinement for treatment of incompetence is so different from other forms of *pretrial* detention, we are also convinced that equal protection principles do not require that [appellant] receive, while confined for treatment, the benefit of the limited work-and-conduct-credit system available to persons confined in jail prior to trial." (*People* v. *Waterman* (1986) 42 Cal.3d 565, 571, fn. 4. [229 Cal.Rptr. 796, 724 P.2d 482].)

In *Waterman,* the court dealt with section 1370 subjects[3] and pointed out that the substantial disparities between the treatment goals for incompetence and drug addiction of those committed to the California Rehabilitation Center (CRC) justified credit distinctions. The former is concerned with the restoration of a specific mental state without which the criminal process cannot proceed. The latter is concerned with criminal rehabilitation.

(b) *Postcommitment Conduct Credit.*

Appellant was at the Atascadero State Hospital pursuant to his section 1026 commitment from March 27, 1980, to October 7, 1982. As stated above, section 1026.5, subdivision (a)(1) denies precommitment conduct credits. ■ Appellant maintains that "[t]he denial of conduct credits which he would have earned had he been incarcerated in state prison extended his period beyond that of the person in prison. Thus, Mr. Mord was not treated equally."

As respondent notes, the case law dictates that this argument fail. *People* v. *Bodis, supra,* 174 Cal.App.3d 435, held section 1026 confinement is for treatment, not punishment. *People* v. *Saffell, supra,* 25 Cal.3d 223, held imprisonment is for punishment, and that there is ample justification for legislative distinctions between those committed for treatment and those committed for punishment, among them, a reason very pertinent to the instant case: "The concept of 'good time' credit only has meaning within the context of a fixed criminal sentence which may not be so extended." (*Id.* at p. 234.) Appellant is not denied equal protection of the law because a person sentenced to state prison can earn postcommitment conduct credits while under section 1026 he may not.

■ Recently the Supreme Court held that equal protection of the law is not violated when pre-1981 mentally disordered sex offenders (MDSO's) are denied conduct credits which a drug-addicted person receives at CRC. (*In re Huffman* (1986) 42 Cal.3d 552 [229 Cal.Rptr. 789, 724 P.2d 475].) The reasoning of the court in *Huffman* was the same as in *People* v. *Waterman, supra,* 42 Cal.3d 565.

Appellant goes to great lengths to distinguish his situation from that of an MDSO or section 1370 inmate, presumably so *Waterman* and *Huffman* will not apply to the argument that section 1026 hospital patients are denied

---

[3] This section provides for the suspension of the criminal process and institution of treatment for a defendant unable, because of a mental disorder, to understand the criminal proceedings or assist rationally in his defense.

equal protection of the law when not given the conduct credit for hospital time that CRC inmates receive.

No cases deal with the difference in treatment given section 1026 patients and CRC inmates. Nevertheless, appellant's claim must fail. ██ The first prerequisite for a valid equal protection argument is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*People* v. *Wasley* (1982) 133 Cal.App.3d 344, 351 [184 Cal.Rptr. 25].) ██ Appellant's only showing here is that "persons such as Mr. Mord, like . . . CRC patients, may have a problem which 'has both physiological and psychological roots' and which 'may well respond to a credit incentive to obey institutional rules.'" Even assuming that speculative assertion makes the two groups, in that respect, "similarly situated," persons committed pursuant to section 1026 must have a mental disease or disorder that a person committed to CRC does not necessarily have. In both *Waterman* and *Huffman,* the fact that the appellant had a mental disorder which a CRC inmate does not necessarily have, and the consequent treatment goal, provided the compelling state justification for separate, more cautious treatment. By analogy, that same holding should apply in this case. (*People* v. *Waterman, supra,* 42 Cal.3d at p. 569; *In re Huffman, supra,* 42 Cal.3d at pp. 561-562.)

### (c) *Merced Manor.*

The record reflects that appellant was released into Merced Manor, a local locked facility, on August 5, 1982. Appellant now contends for the first time that he was not given custody credit for this period when, upon his return to Atascadero in July of 1985, his adjusted maximum commitment date was computed. Appellant rests his claim on the fact that he was not able to find an order releasing him from the Merced facility in the superior court file.

Respondent correctly contends that although there is no order in the record actually releasing appellant from Merced Manor, the record also clearly reflects that appellant was awarded custody credit for the time spent there.

There is an order dated August 5, 1982, placing appellant in Merced Manor for 60 days. On October 5, 1982, appellant signed a contract for placement in the Frontier Halfway House program. On October 7, 1982, the court approved "the plan as outlined in the report of 10-5-82" and ordered appellant committed to the care, custody and control of the Mental Health Department for structured placement in the halfway house.

When appellant's adjusted maximum commitment date was computed, he was given credit for the time spent in custody from the day he was received at Atascadero, March 28, 1980, to the date he was released from Merced Manor on outpatient parole status, October 7, 1982. The adjusted computation included the days spent at Merced Manor.

(d) *Frontier Halfway House.*

■ According to appellant, he spent approximately six months at the halfway house after his release on parole on October 7, 1982. He now asserts for the first time that when his maximum commitment date was adjusted upon his return to Atascadero in July of 1985 he was due custody credits for the time spent in the halfway house. Section 1026.5, subdivision (a)(1) clearly states that in determining the maximum term of commitment one is to be granted custody credits pursuant to section 2900.5 only. Section 2900.5 provides that time spent in a "halfway house" is to be credited. However, the cases dictate that the inquiry does not end there. Before that credit will be granted, it must be determined whether appellant was "in custody" at the halfway house. (*People* v. *Rodgers* (1978) 79 Cal.App.3d 26, 33 [144 Cal.Rptr. 602].) Respondent contends appellant's placement was not sufficiently restrictive as to amount to "custody."

In *People* v. *Reinertson* (1986) 178 Cal.App.3d 320 [223 Cal.Rptr. 670], a defendant contended that he should have received custody credit against his prison term for the "home detention" on which he had been placed pursuant to his probation. The *Reinertson* court stated that the words of section 2900.5 and judicial decision dictate that "custody" is to be broadly construed.

"Whether a particular facility will be regarded as sufficiently restrictive as to amount to custody may constitute a factual question. [Citation.] The courts which have considered the question generally focus on such factors as the extent freedom of movement is restricted, regulations governing visitation, rules regarding personal appearance, and the rigidity of the program's daily schedule. [Citation.]

"While no hard and fast rule can be derived from the cases, the concept of custody generally connotes a facility rather than a home. It includes some aspect of regulation of behavior. It also includes supervision in a structured life style." (*Id.* at pp. 326-327.)

An examination of appellant's halfway house contract reveals the following facts: (1) appellant was charged rent; (2) any refusal to take medication could have led to discharge; (3) a daily list of chores was provided; (4)

participation in one mental health program a week was required; (5) attendance at other various meetings was required; (6) alcohol use, drug use, and possession of weapons were prohibited; (7) visitation by family at the apartment was expected to not take place more than twice a month; (8) curfew was 10 p.m. nightly except on weekends when it was extended to midnight. Applying these facts to the *Reinertson* guidelines presents a close question, but one we need not decide.

 If we were to grant appellant full credit of six months at the Frontier Halfway House, this would then render the district attorney's petition to recommit untimely, but it would not void the recommitment order. As this court held in *People v. Minahen* (1986) 179 Cal.App.3d 180 [224 Cal.Rptr. 460], jurisdiction to extend a term pursuant to section 1026.5, subdivision (b) is not necessarily lost by the tardy filing of the recommitment petition. In fact, section 1026.5, subdivision (a)(2) provides "[t]he time limits of this section are not jurisdictional."

In *Minahen,* the Bureau of Prison Terms erroneously calculated the defendant's release date by failing to give him sufficient custodial credit. Under the correct calculation, the petition to extend the commitment pursuant to section 1026.5 had been untimely filed. In fact, it was filed almost one year after appellant's term should have expired. Appellant argued that once a term expires, a court has no power to hold an extension hearing, it being "clear from the statute that the maximum term of commitment is 'jurisdictional' . . . ." in the fundamental sense. (*People v. Minahen, supra,* 179 Cal.App.3d at p. 185.)

This court rejected that claim, finding that the Legislature indicated the extension procedures of section 1026.5, subdivision (b) are not jurisdictional in the fundamental sense of depriving a court of the power to extend the commitment of a dangerous person solely because the procedures are not complied with: "We believe that the extension provisions of section 1026.5, subdivision (b)(2) were designed primarily to benefit the public and not the individual defendant. . . . Thus, we perceive no reason why an extension petition cannot be filed and considered after the original commitment term has expired upon a showing of good cause as to why the petition was not timely filed and assuming the defendant is afforded procedural due process." (*Id.* at p. 189, fn. omitted.) The court found good cause to relieve the district attorney from default because the error in denying custody credits was not his. The petition, and the hearing on the petition, afforded

procedural due process to the defendant, who had not actually been released from confinement at the time. (*Id.* at p. 191.)[4]

 In this case, even if the appellant is entitled to any or all of the credits claimed, *Minahen* and section 1026.5, subdivision (a)(2) should nonetheless apply, therefore dictating that the trial court had jurisdiction pursuant to section 1026.5. Appellant's attempt to distinguish *Minahen* on the ground that it dealt with an appellant originally sentenced under the Indeterminate Sentence Law is not persuasive. Nothing in *Minahen* suggests that its holding would be different for someone governed by the Uniform Determinate Sentencing Act.

(e) *Failure to Hold the Applicable Parole Hearings.*

 Appellant was released on parole from Atascadero State Hospital on October 7, 1982, pursuant to former section 1611. This section provided in pertinent part: "(a) . . . The maximum period of parole treatment shall not exceed one year. The court shall, at the end of such maximum period, hold a hearing and either renew its approval for additional parole treatment upon the recommendation of the medical director of the state hospital or other facility from which the person was paroled, discharge from the commitment pursuant to Section 1026.2, or direct that the person be returned to the state hospital or other facility. . . .

"(b) If at any time during the period of parole the supervisor of the paroled person is of the opinion that the person no longer meets the conditions of parole and needs extended inpatient treatment, or that the person refuses to accept parole supervision, this information shall be communicated to the medical director of the inpatient facility from which the person was paroled, or a designee. If the medical director or a designee concurs, the parole supervisor shall notify the paroled person, the committing court, the prosecuting attorney, and the attorney of record for the person, of the intent to return the person to an inpatient facility. Such notice shall be in writing and shall state the reasons for the transfer. Within 15 judicial days after the notice has been served on the paroled person, the court shall set a hearing at which the court shall determine whether the transfer will be approved or disapproved. A paroled person who requires inpatient treatment pending the court's determination whether return to an inpatient facility shall be

---

[4]The court noted that "[u]nder no circumstances would the superior court have jurisdiction to entertain an extension petition filed after a defendant is *released* from confinement under his maximum term. This could no longer be viewed as an extension of the maximum term but rather an attempt to impose a new term which is not authorized by section 1026.5." (*Id.* at p. 189, fn. 2.)

approved shall receive such treatment subject to the provisions of Sections 5150, 5200, 5250, and 5300 of the Welfare and Institutions Code."

Since appellant was released on parole on October 7, 1982, a hearing should have been held on October 8, 1983, and annually thereafter, to determine if appellant was to be continued on parole, discharged from his commitment, or returned to the state hospital. These hearings were never held. Also, since on June 27, 1985, a request to revoke appellant's parole was made, according to section 1611, subdivision (b), a parole revocation hearing should have been held within 15 judicial days after notice of the revocation request was given to appellant. This hearing was also not held. This court must determine what remedy, if any, appellant is due for these regrettable procedural violations.

Here again, appellant argues the violations entitle him to custody credit for time served. Appellant claims he cannot be considered to have been on parole from October 8, 1983, onward, because there was no order pursuant to section 1611, subdivision (a), extending his outpatient status beyond the one year allowed by the statute. However, appellant also acknowledges he cannot be considered to have been discharged from his commitment during this period because there was no order doing so under the appropriate provisions of the law. Hence, appellant argues, he ought to be considered a person who, during this period, was not on parole yet was subject to supervision and was, therefore, in a situation analogous to that of a prisoner on work furlough: "This analogy is that Mr. Mord was a person confined in the state hospital, as are work furlough prisoners confined, even though with limited liberty, to go into the community. As such, he is entitled to at least the credits provided by Penal Code section 2900.5."

The reason appellant wants custody credits, of course, is that if they were to be granted, such a finding would mandate holding his commitment should have expired prior to December 1, 1985. This in turn would render untimely the section 1026.5 recommitment petition, which led to the extension of appellant's term. Appellant also points to cases from the mentally disordered sex offender area, the conservatorship area, and the narcotic commitment area, where substantial deviations from the statutory requirements resulted in a loss of jurisdiction and void orders and release. He then argues the same holding ought to apply to the procedural violation of section 1611, subdivision (a). For the reasons stated below, we decide adversely to appellant on both of these contentions.

First, even if appellant were entitled to the credits he claims, pursuant to *People* v. *Minahen, supra,* 179 Cal.App.3d 180, the untimeliness of the petition does not render the recommitment itself void.

Second, appellant's claim that he is entitled to custody credits for the period between October 8, 1983, and July 1, 1985, is negated by the fact he fails to show he was "in custody" so "sufficiently restrictive" as to merit section 2900.5 credit. (See *People* v. *Reinertson, supra,* 178 Cal.App.3d at p. 326.) In fact, the record reflects that for much of this period appellant was living in an independent apartment complex, attending school, and working.

Third, the cases appellant points to as authority for dismissal and release are all factually distinguishable. *In re Hofmann* (1955) 131 Cal.App.2d 758 [281 P.2d 96], *In re Jones* (1964) 61 Cal.2d 325 [38 Cal.Rptr. 509, 392 P.2d 269] (cert. den. 379 U.S. 980 [13 L.Ed.2d 570, 85 S.Ct. 684]), and *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030 [226 Cal.Rptr. 33], all deal with situations where the direct result of the violation of a statutory procedure was that the person contesting the violation lost his liberty. Here, the direct result of the violation of procedures outlined in section 1611, subdivision (a), is that appellant remained free from "custody" in the sense of not being confined. The hearings would have determined whether he was to be discharged from commitment, sent back to Atascadero, or remain on outpatient status. When the hearings were not held in each of the two years they should have been held, the result was appellant was treated as if he were still on outpatient status. He was not "confined" due to failure to hold the hearings, unless it is assumed the result of one of the annual review hearings would have been to discharge appellant from his commitment, thus avoiding extending the commitment order in December of 1985. If this court were to engage in such speculation, the evidence suggests the result of a review hearing would not have been release.

Nevertheless, the fact remains statutory procedures to which appellant was entitled were violated, and the issue of whether appellant is due a remedy for the violations still must be resolved. Respondent contends since appellant never requested the section 1611, subdivision (a), annual review hearings, or the section 1611, subdivision (b), parole revocation hearing, he waived his right to those hearings. Respondent also contends that had the section 1611, subdivision (a) hearings been held, appellant would not have been entitled to a discharge from his commitment; therefore, he was not prejudiced and is not now entitled to any relief. For both of these claims respondent relies on *In re La Croix* (1974) 12 Cal.3d 146 [115 Cal.Rptr. 344, 524 P.2d 816] cert. den. 420 U.S. 973 [43 L.Ed.2d 653, 95 S.Ct. 1395]). Application of that case to the instant facts results in a resolution of only one of the procedural violations, however.

In *La Croix,* the petitioner was arrested for drunk driving and charged with violating his parole. He was notified that he had a right to a

prerevocation hearing, and he requested that hearing, but it was never held. The petitioner then sought a writ of habeas corpus, claiming he was being improperly incarcerated as a parole violator since he had not been accorded the parole revocation hearings mandated by *Morrissey* v. *Brewer* (1973) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593]. The California Supreme Court held that although one with knowledge of his right to revocation hearings could waive them by failing to request them, La Croix had clearly made such a request and was improperly denied his hearing. (*In re La Croix, supra,* at pp. 153-154.) Nevertheless, the failure to hold the prerevocation hearing was held harmless by the court since the petitioner could demonstrate no prejudice by the failure of the hearing to be held: "He presents nothing which even suggests that all factual issues to be presented at the summary prerevocation hearing to which he was entitled would not necessarily have been resolved against him." (*Id.* at p. 155.)

In the present case, appellant cannot be said to have waived his right to the hearings to which he was entitled since nothing in the record suggests the *La Croix* knowledge requirement was present. However, it can be said the failure to hold the section 1611, subdivision (b), parole revocation hearing is clearly harmless because the evidence which was found sufficient to extend appellant's term at the recommitment trial would certainly have been sufficient to revoke his parole had such a revocation hearing been held. Hence, appellant was not prejudiced by the section 1611, subdivision (b) failure.

▮▮▮ However, the same cannot be said about the failure to hold section 1611, subdivision (a) annual hearings. Respondent asserts appellant was not prejudiced by the failure to hold the subdivision (a) hearings because the evidence suggests appellant would not have been discharged from his commitment had the hearings been held. It is true that the record contains a September 8, 1983, letter from Dr. A. J. Rucci, Medical Director of Atascadero State Hospital, recommending appellant be kept on outpatient status pursuant to section 1611, subdivision (a). The record also reflects a September 17, 1984, letter from Dr. Gordon Gritter, Acting Clinical and Medical Director of Atascadero State Hospital, also recommending appellant be kept on section 1611 status. It may very well be appellant would not have been discharged from his commitment had the hearings been held. However, the fact this may be true points up the further speculation that appellant may have been prejudiced by not having a chance to be subjected to the restrictive options the court has in subdivision (a) hearings. For instance, had the result of one of these hearings been to send appellant back to Atascadero, not only would he have earned credits toward release, but perhaps the incidents which led to the initiation of the proceedings to extend his term would never have happened.

Ultimately, however, appellant is not entitled to a remedy for the violation of section 1611, subdivision (a). As respondent points out in its supplemental brief, the law has developed a framework for analyzing such violations, and such analysis in the present case results in the finding that failure to hold the section 1611, subdivision (a) hearings does not invalidate the subsequent act of recommitment.

As respondent correctly notes, in determining the consequences of a failure to comply with a statutory procedure, the framework established by the California Supreme Court in *Pulcifer* v. *County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1], and in *People* v. *McGee* (1977) 19 Cal.3d 948, 958-963 [140 Cal.Rptr. 657, 568 P.2d 382], should be followed.

" 'Traditionally, the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded "mandatory" or "directory" effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. . . . [I]n evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design.' " (*People* v. *Curtis* (1986) 177 Cal.App.3d 982, 987-988 [223 Cal.Rptr. 397], quoting *People* v. *McGee, supra,* 19 Cal.3d at p. 958.)

The inquiry for this court then is whether the hearing provisions of former section 1611, subdivision (a), were mandatory or directory. We believe they were directory.

First, "there is no simple, mechanical test for determining whether a provision should be given 'directory' or 'mandatory' effect. 'In order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation] . . . .' " (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 909-910 [136 Cal.Rptr. 251, 559 P.2d 606], fn. omitted.)

Second, although no cases deal with the violation of former section 1611, the statute itself contains some express language which evidences legislative intent: It states, "[t]he court shall . . . hold a hearing . . . ." However, as the Supreme Court has observed, use of the word "shall" is indicative, but not dispositive, of legislative intent. (*Jones* v. *Tracy School Dist.* (1980) 27 Cal.3d 99, 118 [165 Cal.Rptr. 100, 611 P.2d 441].) And, respondent makes a most persuasive argument that the primary purpose behind the annual review hearings is not to protect appellant's individual interests, but to protect the public's interest in ensuring that insane persons receive the treatment they need. The interest of the state in treating insane persons is a compelling one (see *People* v. *Waterman, supra,* 42 Cal.3d at p. 570), and the interest in protecting society from those insane persons who might harm the public without necessary treatment or confinement encompasses seeing that such individual is treated humanely.

An examination of title 15, part 2 of the Penal Code, beginning with section 1600 through section 1611 and to the end of the title, like section 1026.5, subdivision (b)(2),[5] reveals the primary legislative purpose was to protect the public as efforts are made to treat insane persons. We note, for instance, that section 1601 requires minimum periods of confinement. Those minimum periods were doubled in 1984.

Therefore, holding the object of this statute to be primarily to serve a public purpose, and hence "directory," will not only best accomplish the purpose of public protection, but will best benefit appellant as well. The evidence established appellant represents a substantial danger to other persons during the periods of exacerbation of his illness. A holding by this court that the statute violated is a "mandatory" one, thereby voiding the subsequent recommitment order and releasing appellant into the community, not only exposes the public to a dangerous person but prevents appellant from receiving treatment for his illness.

It must also be kept in mind that the "mandatory-directory" effect is not to be confused with the "mandatory-permissive" dichotomy. The latter deals with deciding whether a statute is one which a public official is obligated to follow, or one which he has discretion to disregard. It is not being asserted here that the procedures set out in section 1611, subdivision (a) are procedures the lower court had discretion to ignore. What is being asserted is that many statutory provisions which are mandatory in the obligatory sense are accorded only directory effect (*People* v. *McGee, supra,* 19 Cal.3d at p. 959), and if this court gives subdivision (a) a "directory" effect that finding would not be inconsistent with settled law.

---

[5] See *People* v. *Minahen, supra,* 179 Cal.App.3d at page 189.

Finally, it would seem any question about whether appellant should be released from his two-year recommitment will be moot before this opinion will become effective. The recommitment dated from December 1, 1985. The two years expired on December 1, 1987. In this regard, we realize our decision herein will still bear on the lower court's right to continue jurisdiction under the original commitment as well as the recommitment.

Our conclusion reached herein does continue the court's jurisdiction pursuant to its recommitment order made in 1985.

## 2. *The Affidavit Requirement.*

In addition to deadlines, section 1026.5, subdivision (b)(2) also requires that the petition for recommitment "state the reasons for the extended commitment, with accompanying affidavits specifying the factual basis for believing that the person meets each of the requirements set forth in paragraph (1)." Appellant alleges that this requirement was not complied with, apparently relying in part on the fact that the petition for recommitment stated it was incorporating a "June 16, 1985" letter from David Jones, and no such letter exists.

However, the reference in the petition to a June 16 letter is clearly only a typographical error, and appellant must have known this. Not only did Mr. Jones's letter of *July 16,* 1985, succinctly set forth the factual basis for Mr. Jones's belief that appellant was a person who met the requirements of section 1026.5, subdivision (b)(1),[6] but the factual incidents that led to the need to submit a recommendation did not occur until late June.

On appeal, appellant argues the petition to recommit does not have accompanying affidavits as required by section 1026.5, subdivision (b)(2). In the court below he did not argue this matter at all, though it was mentioned in a memorandum of points and authorities dated September 6, 1985, which appears in the clerk's transcript. We note also that David Jones was present at the time appellant's counsel argued his motion to dismiss the petition for extended commitment. If appellant believed he was prejudiced by use of Mr. Jones's letter rather than an affidavit, he could easily have called that to the attention of the court during argument and the error could have been corrected. From the record it would appear appellant abandoned any objection to the lack of facts being set out in an affidavit. We hold appellant,

---

[6] Subdivision (b)(1) of section 1026.5 states: "A person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if such person has been committed under Section 1026 for a felony, and who by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others."

through his counsel, waived that requirement set forth in section 1026.5, subdivision (b)(2). We note, too, that appellant cites no authority with respect to his affidavit argument on appeal.

 Similarly, if his claim is that he was denied procedural due process by not being given notice of the conduct which was the basis of the recommendation for extension, that claim must fail as well. The record illustrates the public defender received a copy of the July 16 letter. Respondent notes that the record also reflects that the public defender received a copy of Mr. Jones's June 27, 1985, letter requesting that appellant's parole be revoked and a copy of the letter sent by Dr. Gritter, the Acting Clinical and Medical Director of Atascadero State Hospital, dated June 28, 1985, concurring with that revocation request. Appellant contends that "careful consideration" must be present when an extension of a commitment is sought. These letters clearly show such consideration. The lower court did not err in refusing to dismiss the recommitment petition on this ground.

### 3. *The Recommendation for Extension.*

 Appellant alleges a third section 1026.5, subdivision (b)(2) procedural infirmity. In addition to the 90-day deadline for filing the petition, this section also sets forth that, not later than 180 days prior to the termination of the maximum term of commitment, the medical director of a state hospital or other treatment facility shall submit a recommendation on extension to the prosecuting attorney. Appellant claims that this recommendation was not timely filed, and that it was not submitted by the proper official. Respondent acknowledges that the letter was not timely, but asserts that its tardiness was justifiable and not prejudicial. Respondent also asserts that appellant's claim that the recommendation was not made by the proper officials is not supported by the record.

 With respect to the recommendation's timeliness, it is clear that it was submitted on July 16, 1985, 137 days before the expiration of appellant's term. No published cases deal with the jurisdictional effect of a violation of this specific deadline, so the inquiry becomes whether this violation of the 180-day deadline will be treated differently than a violation of the 90-day deadline for filing the petition to recommit. As noted earlier, this court in *People* v. *Minahen, supra,* 179 Cal.App.3d at page 187, held violations of the 90-day deadline for filing of the recommitment petition are not jurisdictional, provided there is good cause for delay and procedural due process is afforded the defendant: ". . . the Legislature has indicated that the extension procedures of section 1026.5 are not jurisdictional in the fundamental sense of depriving a court of the power to extend the commitment of a dangerous person solely because the procedures are not complied with."

(*Ibid.*) There is no reason to believe, or to hold, that this rule ought not apply to violation of the 180-day deadline for submitting the recommendation.

Respondent makes a persuasive argument that there was good cause for delay. In *People* v. *Echols* (1982) 138 Cal.App.3d 838 [188 Cal.Rptr. 328], the petition for defendant's recommitment was later than 90 days before the end of his original term because the prosecutor did not learn of the facts that would lead to a finding of defendant's dangerousness until within the 90-day period. The court balanced the prejudicial effect of the delay against the justification for it and found no due process violation. (*Id.* at pp. 842-843.) Respondent persuasively analogizes *Echols* to the present case. The recommendation for extension of appellant's term was based substantially on his acquisition of weapons. This discovery took place sometime between June 17, 1985, when appellant was involved in an altercation at his apartment complex, and the July 16, 1985, letter informing the court of the discovery. At most, this discovery occurred 163 days before the end of the term. It was therefore impossible for a timely recommendation to have been submitted. Given this, and given appellant makes no concrete showing of prejudice, the facts do not present a situation where the violation ought to have deprived the trial court of jurisdiction.

Similarly, appellant's other claim of infirmity under this part of section 1026.5, subdivision (b)(2) is without merit. This statute at that time called for the recommendation to recommit to be submitted by "the medical director of a state hospital or other treatment facility . . . ." As Psychiatric and Forensic Coordinator of the Merced County Mental Health Department, David Jones, the author of the recommendation to recommit appellant, does not fit that definition.[7] However, although respondent does not mention that appellant did not make this contention in his motion below, respondent does correctly point out that Mr. Jones's letter included the statement that Mr. Gordon Migliore, a social worker at Atascadero State Hospital, concurred with the recommendation to recommit. Also, 18 days earlier, Dr. Gordon Gritter, Atascadero State Hospital Medical Director, had submitted a letter to the court concurring with Mr. Jones's earlier request to revoke appellant's parole. The technical requirement of the statute is not fulfilled by Dr. Gritter's letter, but it certainly lessens any prejudicial effect. In fact, appellant's only claim of prejudice from this error is apparently his general claim that all of the alleged errors, when taken together, illustrate a failure to afford him his rights.

---

[7] In 1985 this statute was amended to expressly include persons in Mr. Jones's position. The recommendation may now be submitted by ". . . the local program director, if the person is being treated outside a state hospital setting . . . ." (Stats. 1985, ch. 1232, § 3.5, urgency, eff. Sept. 30, 1985.)

However, that hardly seems the case when the July 16, 1985, recommendation to extend appellant's term came from the person closest to his treatment, his case supervisor, David Jones.

### 4. *Timeliness of the Extension Order.*

█ The final section 1026.5, subdivision (b) procedural infirmity appellant alleges is that the recommitment order itself was not timely filed.[8] Although the order was entered on December 16, 1985, and appellant's original term had expired on December 1, 1985, appellant makes no showing of error. In fact, appellant acknowledges that the statute does not specifically state that the order must be entered before the expiration of the maximum term. Further, since the order itself states it is extending appellant's term for two years from December 1, 1985, appellant was not prejudiced into serving an additional 15 days.

Finally, as respondent correctly notes, "the order was not filed immediately in order to accommodate appellant . . . ." Appellant's trial was completed on November 22, 1985, eight days before expiration of his term. As he was found on that day to be a person who, by reason of a mental disease, defect or disorder, represented a substantial danger of physical harm to others, the order could have been entered at any time. The matter was continued to December 3, 1985, to allow appellant to renew his motion for conduct credit and to dismiss. Appellant's claim that estoppel ought not to apply because he committed no affirmative act is therefore not supported by the record.

There was no procedural infirmity committed by the December 16, 1985, filing of the extension order.

We conclude the trial court had jurisdiction to extend appellant's term pursuant to section 1026.5.

### PARTS II, III*

. . . . . . . . . . . . . . . . . . . .

---

[8] Respondent acknowledges that the section 1026.5, subdivision (b)(4) requirement that the trial take place no later than 30 days before the expiration of the maximum term was not complied with, and correctly argues that this error was not serious enough to give rise to a loss of jurisdiction to extend appellant's term. However, appellant did not contest this error on appeal.

* See foonote, *ante*, page 1090.

## PART IV

While the cumulative effect of the many errors in the proceedings below is not to be ignored, nor the errors condoned, we conclude the recommitment order of the trial court should be affirmed under the circumstances of this case.

The recommitment order of December 16, 1985, is affirmed.

Woolpert, Acting P. J., and Martin, J., concurred.