Filed 2/24/15  P. v. Busse CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059970 |
| v. | (Super.Ct.No. FELSS1205363) |
| MICHAEL JAMES BUSSE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steve Malone, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

1

While imprisoned after pleading guilty to felony stalking, defendant and appellant Michael James Busse was declared a Mentally Disordered Offender (MDO) pursuant to Penal Code[1] section 2962. On December 6, 2012, the People filed a fourth petition to extend defendant's commitment, which was to expire on April 18, 2013. After a jury trial, defendant's commitment was extended for another year, or until April 18, 2014.

On appeal, defendant attacks the jury verdict on the ground that the People relied on stale evidence that did not prove all elements required to support recommitment. We disagree and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2004, defendant pled guilty to stalking (§ 646.9, subd. (a)) in a prosecution venued in San Bernardino County. He admitted two prior convictions and was sentenced to five years in state prison. In 2009, defendant was committed to Atascadero State Hospital (Atascadero) as an MDO in connection with the stalking prosecution and sentence.

While still at Atascadero, defendant broke a leg off a table and swung it at several staff members, causing the People in San Luis Obispo County to charge him with assault with a deadly weapon and resisting arrest. In connection with this case, defendant was committed to a state hospital under suspicion that he was incompetent to stand trial. (§ 1370.)

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

2

Defendant testified at trial on the People's petition to extend his MDO commitment from 2013 to 2014. He began by giving some background history and explained that he had taken some classes in law because of "how unfair the [court] system is towards the defendants" and a perception that "in a court of law today the defendant is guilty until proven innocent."[2] Defendant admitted his stalking conviction, but implied that an inadequate investigation took place because "the State of California had a great interest in [his] conviction at that time" and because "your parole agent, the State of California is just out to get you anyways." He also accused all prosecutors of being "on the same team" to "get [him]." This appears to be because, although defendant admits he broke a leg off of a table at Atascadero and swung it at several staff members, he perceived unfairness in the facts that he was charged with somewhere between 23 and 50 counts of assault with a deadly weapon and that he was charged with felony resisting an executive officer instead of misdemeanor resisting arrest.

In addition to the theme of persecution by government authorities, defendant testified at length about his use of alcohol and illicit substances. In fact, he adamantly denied having a severe mental disorder and indicated his "main issue" was with "drugs

---

[2] Defendant eventually acknowledged that the People bear the burden in criminal prosecutions. He made no attempt to square this statement with his earlier accusation that he was presumed guilty. In addition, defendant later testified that he did not recall threatening to kill all the judges in the county of his prosecution, and that he knew that "[t]he judges are there to ensure that [he] receive[s] a fair and impartial trial." No explanation for how this knowledge fits into defendant's theories about the judicial system appears in the record before us. Instead, defendant, after being asked if the judges were "in on the conspiracy," stated: "Conspiracy[?] I don't know anything about a conspiracy."

and alcohol." Defendant started stealing alcohol from his parents' liquor cabinet at age nine, and at the same age he used money he earned mowing lawns to buy marijuana. The last time defendant was released into the community, he "was drinking as much as [he] could buy, doing as much dope as [he] could buy." He estimated he smoked 20 to 30 marijuana cigarettes a day. He started using methamphetamine at age 18 and consumed a quarter ounce each weekend. According to defendant's trial testimony, he is "the type of person [who would] work two weeks, earn [a] paycheck, [and] blow it all on drugs in two days." He used marijuana and methamphetamine "all the time" when he was released in 2008.

While denying drug use in prison or at state hospitals, defendant admitted making "pruno," or manufactured alcohol, while he was at the San Luis Obispo jail and Patton State Hospital (Patton), where he was confined for approximately six months while a court determined whether he was competent to stand trial on charges from a county "up north." Defendant went so far as to brag that he "made the best stuff on the block." He explained that he did so by hiding fruit and sugar in containers so he could "make it 24/7, it's nonstop all the time." As long as he remained "discreet" and did not "make it look obvious," defendant stated he could manufacture alcohol without detection even during his confinement at both Patton and a local jail.

Defendant also admitted having threatened to kill his defense attorney, who allegedly did not want the case to go to trial even though defendant "was going to beat

4

it." When asked why he threatened his counsel, defendant succinctly stated: "I was angry and venting."

As indicated previously, defendant roundly denied having a severe mental disorder. He admitted taking Zyprexa, which he said was an "Antipsychotic for hearing voices," when he was at the San Luis Obispo County jail. However, defendant claimed he had made up symptoms only because he could not sleep and knew the medication would help with insomnia. Similarly, defendant acknowledged that he had at one point felt suicidal during his confinement, but he chalked his despair up to having been in solitary confinement.

After defendant provided this testimony, the court took a noon recess. When proceedings were set to resume, defendant invoked his right against self-incrimination under the Fifth Amendment to the United States Constitution and refused to retake the stand. Defendant persisted in his refusal even after the court told him he had no Fifth Amendment rights in an MDO extension proceeding, and that he would be violating a direct court order if he still would not testify. When the jury returned, the court again ordered defendant to testify and informed the jury he was violating a court order when he would not comply.

Much of the remaining testimony came from two doctors, Olayinka Kamson and Maryann Choi, staff psychiatrists at Patton. Dr. Kamson and Dr. Choi both testified that they had diagnosed defendant with schizophrenia, paranoid type, which qualifies as a severe mental disorder. They also agreed that defendant was not in remission and was

5

dangerous to others at the time of trial. Dr. Kamson based the latter conclusion on the facts that defendant did not understand he had a mental illness, let alone what the signs and symptoms of decompensation would be, he would not continue taking medication prescribed for schizophrenia, and he would begin using alcohol and drugs again, all of which would lead him to commit violent acts like those he had committed in the past. Dr. Choi based her conclusion on defendant's entire history of threats and violence, his impulse control problems as demonstrated by incidents in custody at Atascadero and the San Luis Obispo County jail, his failure to acknowledge that he has a mental illness or to regularly agree to treatment, and his exuberance regarding using alcohol and drugs.

Both doctors indicated they were basing their conclusions not only on his statements and behavior on the witness stand, but also on what they knew about defendant's history from his confinement at Patton from April to August 2012, which was when they had last had contact with him. Of particular concern to Dr. Kamson and Dr. Choi was the fact that Patton received a call from a National Guard recruiting office that had received odd letters marked with defendant's name, prisoner number, and his correct address at Patton. In each of the letters, defendant stated he was writing because he needed to contact his "unit with the Ontario Army National Guard 19 Delta Force." The letters also express a desire to see an oil platform built to refine gasoline to 110 octane, all money cut from the California state parole budget in 2012, and all troops withdrawn from Afghanistan to let "them fight each other" instead of the United States.

On the latter topic, defendant repeatedly wrote: "Let that place explode into sectarian violence[,] the sooner the better."

In a similar vein, Dr. Choi expressed concern that in September 2012, defendant had written a letter threatening to put a bullet in the heads of all the judges in San Luis Obispo County. Although she provided no details, Dr. Choi also indicated defendant had threatened to kill his parole agent. He did so out of anger at his continued incarceration, which he believed to be part of "a conspiracy to keep him locked up."

After hearing this and other related testimony, the jury found that defendant met all criteria for recommitment. The trial court subsequently extended the maximum commitment period for one year, or to April 18, 2014.

ANALYSIS

Defendant's sole argument on appeal is that the evidence we have summarized is insufficient to support the jury's finding that he was not in remission and dangerous to others at the time of trial. After rejecting the Peoples' contention that this appeal is moot, we explain why defendant's contention fails.

1. *This appeal is not moot*

The People argue the MDO commitment defendant challenges on this appeal is moot because the People do not plan to seek additional commitments in San Bernardino County, given that defendant has also been committed in San Luis Obispo County. Defendant's briefs concede that the People plan to abandon the San Bernardino County commitment. However, no evidence of an intention to abandon the San Bernardino

7

County commitment appears in the record on appeal; the sole portion of the record to which the parties cite is a report about defendant's mental condition that describes his two commitments but does nothing to show that the People have abandoned or are abandoning the San Bernardino County commitment. Because of this gap in the record, we do not assume that the People actually have abandoned the San Bernardino County commitment and may not conclude that any appeal from a San Bernardino County commitment order would be moot because of the San Luis Obispo County commitment.

We also find this appeal is not rendered moot by the expiration of the commitment term defendant challenges. " '[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief.' " (*People v. Rish* (2008) 163 Cal.App.4th 1370, 1380 (*Rish*).) Generally, an appeal from a commitment order becomes moot if the commitment period expires. (*People v. Merfield* (2007) 147 Cal.App.4th 1071, 1074 (*Merfield*); see *People v. Jenkins* (1995) 35 Cal.App.4th 669, 672, fn. 2 (*Jenkins*), abrogated on other grounds by *People v. Robinson* (1998) 63 Cal.App.4th 348, 352, fn. 2.)

However, an appeal from a MDO recommitment has a practical effect and is not moot if its decision would affect the trial court's jurisdiction over subsequent recommitment proceedings. (*People v. J.S.* (2014) 229 Cal.App.4th 163, 170 [Fourth Dist., Div. Two] (*J.S.*).) For example, in *J.S.*, we concluded that an appeal from an order dismissing a petition to challenge an initial commitment (§ 2966) was not moot because, "if an offender's initial commitment is improper, any extended commitment would also

8

be improper." (*Id.* at p. 171.)  Similarly, in *People v. Fernandez* (1999) 70 Cal.App.4th 117, 134 (*Fernandez*)), even though the defendant's commitment term had expired, the reviewing court "conclude[d] that the appeal is not moot because [its] decision may still affect the lower court's right to continue jurisdiction under the original commitment as well as the recommitment."  The issue on which the court provided guidance was whether a trial court lost jurisdiction over a petition to extend an MDO commitment when certain procedural deadlines were not met. (*Id.* at pp. 126-127; see *People v. Mord* (1988) 197 Cal.App.3d 1090, 1114-1115 (*Mord*) [appeal not moot because resolution of allegations that procedural errors had occurred in the process for recommitting defendants found not guilty by reason of insanity (§ 1026.5) could affect the lower court's jurisdiction to keep the appellant confined].)  In both *Fernandez* and *Mord*, the court issued a full opinion on the merits even though it rejected contentions that procedural irregularities deprived the trial court of jurisdiction to keep the defendant confined on the instant or on subsequent recommitment petitions.  (*Mord*, at p. 1115 ["Our conclusion reached herein does continue the court's jurisdiction pursuant to its recommitment order made in 1985"]; *Fernandez*, at p. 134 [citing *Mord* for the proposition quoted *ante*].)

In sum, then, an appeal from a commitment order becomes moot if the commitment period expires and no question is raised that could alter the superior court's jurisdiction over the defendant's confinement.  In this case, defendant complains that the evidence upon which the People relied at trial was stale because most of it was more than

one year old.  Whether we agree with or reject this proposition, the holding we announce

could affect the way in which the People present evidence at later recommitment trials,

should any such proceedings occur.  Under *Fernandez* and *Mord*, the fact that defendant

makes contentions that could, if successful, affect later recommitment proceedings means

that the appeal is not moot.  We therefore proceed to the merits of defendant's

contentions.

    2.  *Substantial evidence supports the judgment*

Once a prisoner has been committed as an MDO (§ 2962), he/she may be

recommitted annually on petition by the People (§ 2970, subd. (b)).  At the

recommitment stage, the People need prove that, at the time of trial, "the patient has a

severe mental disorder, that the patient's severe mental disorder is not in remission or

cannot be kept in remission without treatment, and that by reason of his or her severe

mental disorder, the patient represents a substantial danger of physical harm to others."

(§ 2972, subd. (c).)  We review trial court determinations regarding MDO criteria "for

substantial evidence, drawing all reasonable inferences, and resolving all conflicts, in

favor of the judgment."  (*People v. Martin* (2005) 127 Cal.App.4th 970, 975, disapproved

on other grounds by *People v. Achrem* (2013) 213 Cal.App.4th 153, 157.)

Here, substantial evidence supports the judgment because Dr. Kamson and

Dr. Choi both testified that defendant meets all three recommitment criteria, and their

testimony is supported by specific facts about defendant, his mental condition, and his

history.  First, his schizophrenia, paranoid type, qualifies as a severe mental disorder.

Second, based on his history and his testimony on the first day of trial, defendant's schizophrenia was not in remission.  Finally, both doctors opined that defendant posed a risk of physical harm to others because he had little understanding of his schizophrenia, suffered from poor impulse control, took medications only sporadically, and expressed exuberance at the thought of using illegal drugs, which would only exacerbate his symptoms and increase the likelihood that he would engage in violent acts like those in which he had engaged in the past, when he threatened to kill people who had displeased him.  Because the record supports the conclusions of Dr. Kamson and Dr. Choi that defendant has a severe mental disorder, that his disorder is not in remission, and that he is dangerous to others, substantial evidence supports the judgment.

Defendant does not challenge the conclusion that he has a severe mental disorder, but he does attack the jury's findings on the other two elements the People needed to prove.  With few exceptions, though, all he argues is that the People failed to prove that he had engaged in behavior indicating a lack of remission or dangerousness in the year preceding his trial.  As we explain *post*, this position is unpersuasive.

The only statutory language we have found that limits the age of evidence used at trial on an MDO recommitment petition is contained in subdivision (a)(3) of section 2962.  This provision reads, as relevant:  "The term 'remission' means a finding that the overt signs and symptoms of the severe mental disorder are controlled either by psychotropic medication or psychosocial support.  A person 'cannot be kept in remission without treatment' if *during the year prior to the question being before the Board of*

11

*Parole Hearings or a trial court*, he or she has been in remission and he or she has been physically violent, except in self-defense, or he or she has made a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family, or he or she has intentionally caused property damage, or he or she has not voluntarily followed the treatment plan." (§ 2962, subd. (a)(3), italics added.)

In contrast, the Legislature imposed no time limits on the evidence used to prove that a MDO is not in remission, or that he is presently dangerous. (Compare §§ 2962, subd. (a)(3) with 2972, subd. (c).) The fact that the Legislature knew how to limit the age of the evidence used to prove MDO criteria but chose not to do so in the context of remission and dangerousness " 'indicates it intended no such requirement.' " (*People v. Vaughn* (2014) 230 Cal.App.4th 322, 330 [knowledge requirement in one statute, but not in another related statute, shows legislative intent not to require knowledge in the related statute].)

Even more fatal to defendant's theory is subdivision (f) of section 2962, which reads in full: "As used in this chapter, 'substantial danger of physical harm' does not require proof of a recent overt act." While this subdivision may be silent regarding the proof needed to show that a MDO is not in remission, it definitively disproves defendant's claim that the People could only rely on acts that occurred in the year preceding trial when proving present dangerousness.

Having established that the rule defendant asks us to apply lacks support in the law, we now briefly address defendant's specific attacks on the People's evidence. Our task is uncomplicated with regard to proof that defendant was dangerous; the only argument defendant makes about this evidence in his briefs on appeal is that the People relied on bad acts that were more than one year old. Because we disagree that only acts within the year before trial could be relevant, we need say no more about defendant's challenges to the proof that he posed a risk of physical harm to others.

Regarding whether he was in remission at the time of trial, defendant points only to potential difficulties with the testimony of Dr. Kamson, but does not explain why Dr. Choi's opinion that he had not achieved remission status lacked evidentiary support. If what defendant means is that Dr. Choi cannot have had valid information about whether he had entered remission because she had not met with him for over one year, we find this fact is not dispositive. As we have already noted, Dr. Choi explicitly stated that she was basing her opinions not only on what she knew of defendant's history, but also on what she had observed while defendant testified. During that period of time, Dr. Choi heard defendant deny that he has a mental illness, express a conviction that he was the victim of a conspiracy theory implicating actors from multiple government agencies, and boast about his drug use and illegal manufacturing of alcohol, even while he was in custody. Dr. Choi therefore had a solid basis for opining that defendant was not in remission because "the overt signs and symptoms of the severe mental disorder [were

not] controlled either by psychotropic medication or psychosocial support." (§ 2962, subd. (a)(3).)

For these reasons, we find that substantial evidence supports the jury's findings that defendant was not in remission and that he posed a risk of physical harm to others at the time of trial. We consequently affirm the judgment.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

McKINSTER
J.

14