[No. A041708. First Dist., Div. Two. Sept. 18, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
HARRY CARL HARNER, Defendant and Appellant.

**COUNSEL**

Jay Ruskin, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M.

Helfman and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENSON, J.**—Harry Carl Harner appeals from an order denying his motion for discharge from outpatient status as a mentally disordered sex offender (MDSO) due to the failure of the court below to hold annual hearings to review his status. We conclude that the motion was properly denied and therefore affirm the order.

The record on appeal in this case is rather sparse. However, from the brief clerk's and reporter's transcripts and an augmentation to the record,[1] the following procedural history appears undisputed: On March 7, 1978, appellant entered a plea of guilty to one count of violation of Penal Code section 286, subdivision (b)(2)[2] (sodomy with a minor under 16 years of age), and to one count of violation of section 288a, subdivision (c) (oral copulation with a minor under 14 years of age and more than 10 years younger than the offender). Both of these crimes were committed by appellant, who was then 27 years old, against an 8-year-old child. ■■ ■■ In April 1978, appellant was found to be an MDSO pursuant to Welfare and Institutions Code former section 6300 et seq.[3] On May 8, 1978, he was committed to Atascadero State Hospital for treatment, with a maximum confinement period of four years and eight months. He was placed on outpatient status, pursuant to sections 1600 and 1602, on December 9, 1981. No review of his outpatient status was made prior to the time he filed his motion for discharge from that status on December 21, 1987.[4]

The superior court denied appellant's motion for discharge from outpatient status on January 12, 1988, and set the matter for a hearing to

---

[1] This augmentation consists of the appellant's motion for discharge from outpatient status and the People's response thereto. In those documents, counsel for the parties indicated concurrence in the description of events leading to this appeal.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Welfare and Institutions Code section 6300 and associated MDSO laws were repealed by Statutes 1981, chapter 928, section 2, page 3485; however, these provisions remain applicable to persons previously committed as mentally disordered sex offenders. (*Baker* v. *Superior Court* (1984) 35 Cal.3d 663, 665-668 [200 Cal.Rptr. 293, 677 P.2d 219]; *People* v. *Sherman* (1985) 167 Cal.App.3d 10, 12 [212 Cal.Rptr. 861], fn. 2; *People* v. *Lamport* (1985) 165 Cal.App.3d 716, 718 [211 Cal.Rptr. 665], fn. 2.) "[T]he legislative purpose in repealing MDSO commitment procedures was to treat sexual offenders more harshly." (*Baker* v. *Superior Court, supra,* 35 Cal.3d at p. 666.)

[4] In their brief, the People do not concede this forthrightly, but they have never made any suggestion to the contrary.

determine whether outpatient status should be extended. Notice of appeal from the court's order was filed on March 10, 1988. Thereafter on April 1, 1988, following review of a report from Community Mental Health, the court determined that appellant's outpatient status should be extended for one year. The matter was placed on the July 6, 1988, calendar for receipt of a quarterly report[5] and on the March 28, 1989, calendar for review of outpatient status.

Welfare and Institutions Code former section 6300 defined an MDSO as follows: " '[M]entally disordered sex offender' means any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." Pursuant to section 1602, subdivision (a), a person committed as an MDSO *may* be placed on outpatient status if (1) the director of the treatment facility to which the person has been committed "advises the court that the defendant will not be a danger to the health and safety of others *while on outpatient status,* and will benefit from such outpatient status"; (2) the community program director or his designee "advises the court that the defendant will not be a danger to the health and safety of others *while on outpatient status,* will benefit from such status, *and identifies an appropriate program of supervision and treatment*"; and (3) after a hearing, the court "specifically approves the recommendation and plan for outpatient status." (Italics added.)

Section 1606 provides: "Outpatient status shall be for a period not to exceed one year. At the end of the period of outpatient status approved by the court, the court shall, after actual notice to the prosecutor, the defense counsel and the community program director, and after a hearing in court, either discharge the person from commitment under appropriate provisions of the law, order the person confined to a treatment facility, or renew its approval of outpatient status. Prior to such hearing, the community program director shall furnish a report and recommendation to the medical director of the state hospital, where appropriate, and to the court, which the court shall make available to the prosecutor and defense counsel. The person shall remain on outpatient status until the court renders its decision unless hospitalized under other provision of the law. The hearing pursuant to the provisions of this section shall be held no later than 30 days after the end of the one-year period of outpatient status unless good cause exists. The

---

[5] Section 1605, subdivision (d), provides that the outpatient treatment supervisor shall submit a report setting forth the status and progress of the defendant to the court at 90-day intervals following the beginning of outpatient treatment. There is no indication in the record before us that such reports were ever submitted in this case prior to the hearing on the motion for discharge from outpatient status.

court shall transmit a copy of its order to the community program director or a designee."[6]

█ Appellant contends that the failure of the court to hold annual hearings to review his status invalidates any further attempt of the state to exercise control over him under the MDSO statutes and thus requires his discharge from outpatient status. In *People* v. *McGee* (1977) 19 Cal.3d 948 [140 Cal.Rptr. 657, 568 P.2d 382], Justice Tobriner, writing for a unanimous court, explained: █ "Traditionally, the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded 'mandatory' or 'directory' effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. As we explain below, *in evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design.*

"Although the parties to this action have utilized the mandatory-directory terminology in their briefs, both parties, sharing the confusion exhibited in some past judicial decisions, have improperly equated the mandatory-directory duality with the linguistically similar, but analytically distinct, 'mandatory-permissive' dichotomy. █ As we explained recently in *Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606] . . . ., in the latter context 'the term "mandatory" refers to an obligatory [procedure] which a governmental entity is required to [follow] as opposed to a permissive [procedure] which a governmental entity may [follow] or not as it chooses. By contrast, the "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]' (See also *Ryan* v. *Byram* (1935) 4 Cal.2d 596, 603-604 . . . .)" (*Id.* at pp. 958-959, brackets in original, italics added.)[7]

"Although the mandatory-directory and obligatory-permissive dichotomies are thus analytically distinct, in some instances there is an obvious

---

[6] A 1985 amendment to this section added the next to last sentence. (Stats. 1985, ch. 1232, § 16, pp. 4229-4230.) The People have never contended that any good cause existed for the failure to hold annual review hearings in this case.

[7] It has not been suggested that the duty to hold annual review hearings in this case was permissive rather than obligatory. The issue is the effect to be accorded the failure to comply with the concededly obligatory requirements of the statute.

relationship between the two. If, for example, a statute simply embodies a permissive procedure with which a governmental entity may or may not comply as it chooses, the entity's failure to comply will generally not invalidate the entity's subsequent action. The converse of this proposition is not always true, however, for as we observed in *Morris,* '[m]any statutory provisions which are "mandatory" in the obligatory sense are accorded only "directory" effect.' " (*People* v. *McGee, supra,* 19 Cal.3d at p. 959, citing *Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606], fn. 4.)

"As Chief Justice Gibson explained in *Pulcifer* v. *County of Alameda* [1946] 29 Cal.2d 258, 262 [175 P.2d 1], there is no simple, mechanical test for determining whether a provision should be given 'directory' or 'mandatory' effect. ■ 'In order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation]. . . .' " (*Morris* v. *County of Marin, supra,* 18 Cal.3d 901, 909-910, fn. omitted, brackets in original.) "[G]enerally, requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional unless a contrary intent is clearly expressed. [Citations.] In ascertaining probable intent, California courts have expressed a variety of tests. In some cases focus has been directed at the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment. [Citation.]" (*Edwards* v. *Steele* (1979) 25 Cal.3d 406, 410 [158 Cal.Rptr. 662, 599 P.2d 1365].)

■ Applying this framework, we hold that the annual review provisions of section 1606 are directory since the primary purpose of the statutory scheme is protection of society and a holding that the review provisions are mandatory would defeat that purpose by automatically releasing appellant, a child molester who was found mentally disordered, from any further supervision or treatment without a court's determination that he is no longer in need of such supervision or treatment.

■ "[T]he California cases have made it plain that the mentally disordered sex offender law is designed to serve [two] legislative aims, and although confinement thereunder is not 'solely' for the protection of society,

that is nevertheless its 'primary purpose' (*In re Bevill* (1968) . . . 68 Cal.2d 854, 858 [69 Cal.Rptr. 599, 442 P.2d 679]); rehabilitative treatment of the mentally disordered sex offender is, at best, its 'secondary purpose' [citation]." (*People* v. *Feagley* (1975) 14 Cal.3d 338, 361 [121 Cal.Rptr. 509, 535 P.2d 373].)[8] "Outpatient status is not a privilege given the MDSO to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the MDSO and cause no undue hazard to the community. (See Pen. Code, § 1603, subds. (a) and (b).)" (*People* v. *Wymer* (1987) 192 Cal.App.3d 508, 513 [237 Cal.Rptr. 301].)[9]

The dissent contends that the primary purpose of section 1606 is not protection of the public but, rather, protection of the MDSO's right to discharge from outpatient status after one year unless a court orders otherwise. ■ Our view is exactly the opposite: the purpose of section 1606 is to protect society by assuring that no MDSO is released from supervision and treatment or continued on outpatient status without a court order determining that is appropriate. ■ The dissent asserts that "a mentally disordered sex offender may not be released from confinement and made an outpatient if there is any discernible likelihood he is still dangerous." (Dis. opn., *post*, p. 1412.) This is incorrect. An MDSO may not be placed on outpatient status unless it is determined that, pursuant to the language of section 1602, he "will not be a danger to the health and safety of others *while on outpatient status.*" Outpatient status includes "an appropriate program of supervision and treatment" identified by the community program director. (§ 1602, subd. (a)(2).) To say that it has been determined that a defendant, previously found to be "predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others" (Welf. & Inst. Code, former § 6300), will not be a danger while receiving supervision and treatment is certainly not to say that he will not be a danger under any circumstances, regardless of treatment.

The final flaw in the dissent's position that protection of society is not the purpose of this statute is the assertion that all the protection needed for

---

[8] The dissent argues that *Feagley* and *Bevill* do not stand for the proposition that protection of society is the primary purpose of the MDSO law because they refer to *confining* or *quarantining* such offenders. (Dis. opn., *post*, pp. 1421-1422.) We find this attempted distinction a matter of semantics. Although an MDSO on outpatient status may not be confined or quarantined in a literal sense, he is still under the control of state authorities pursuant to a statutory scheme which, as we demonstrate in this opinion, has as its primary purpose the protection of society.

[9] Section 1603 contains provisions for the placing on outpatient status of persons convicted of certain violent crimes which are analogous to the provisions of section 1602 as pertinent to this discussion.

society is contained in sections 1608 and 1609. Section 1608 provides a procedure for revocation of outpatient status, following a court hearing, if "the outpatient treatment supervisor is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment." Section 1609 provides a procedure for confinement in a state hospital or other treatment facility, following a court hearing, if "the prosecutor is of the opinion that the person is a danger to the health and safety of others" while on outpatient status. While these sections do provide mechanisms for revocation of outpatient status at the request of the outpatient treatment supervisor or upon petition of the prosecutor, they do not assure that there will be regular periodic review of outpatient status by the court as required by section 1606. There may well be situations where the court would deem revocation of that status appropriate although neither the outpatient treatment supervisor or the prosecutor had taken steps themselves to seek revocation.

The People correctly point out that this case is analogous to *People* v. *Mord* (1988) 197 Cal.App.3d 1090 [243 Cal.Rptr. 403]. There the defendant was committed to Atascadero State Hospital pursuant to section 1026 after being found not guilty by reason of insanity. In 1982 he was granted a parole to community outpatient treatment pursuant to former section 1611, which provided in pertinent part: "The maximum period of parole treatment shall not exceed one year. The court shall, at the end of such maximum period, hold a hearing and either renew its approval for additional parole treatment upon the recommendation of the medical director of the state hospital or other facility from which the person was paroled, discharge from the commitment pursuant to Section 1026.2, or direct that the person be returned to the state hospital or other facility." No annual hearings were held in 1983 or 1984. In July 1985, the defendant's outpatient status was revoked. Thereafter a petition to extend his commitment pursuant to section 1026.5 was filed and after a hearing he was ordered returned to Atascadero for an additional two years.

The court in *Mord,* although agreeing that former section 1611 had been violated, rejected the contention that the failure to hold the applicable review hearings invalidated the subsequent recommitment. Applying the principles for determining whether the statute should be accorded a mandatory or directory effect, as set forth in *People* v. *McGee, supra,* 19 Cal.3d at pages 958-963 and *Pulcifer* v. *County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1], the court concluded that the hearing provisions of former section 1611 were directory.[10] It reasoned that "the primary purpose behind

---

[10]The *Mord* court, like the Supreme Court in *People* v. *McGee, supra,* 19 Cal.3d 948, 958-959, and *Morris* v. *County of Marin, supra,* 18 Cal.3d 901, 908, footnote 4, recognized that in determining whether the statute was mandatory or directory: "It must also be kept in mind

the annual review hearings is not to protect appellant's individual interests, but to protect the public's interest in insuring that insane persons receive the treatment they need." (*People* v. *Mord, supra,* 197 Cal.App.3d at p. 1114.) The court further stated that holding the statutory provision to be directory "will not only best accomplish the purpose of public protection, but will best benefit appellant as well. . . . A holding by this court that the statute violated is a 'mandatory' one, thereby voiding the subsequent recommitment order and releasing appellant into the community, not only exposes the public to a dangerous person but prevents appellant from receiving treatment for his illness." (*Ibid.*)[11]

We similarly conclude here that to hold the annual review requirement of section 1606 directory will best promote the statutory purpose of public protection[12] and will allow appellant to be provided with any continuing

---

that the 'mandatory-directory' effect is not to be confused with the 'mandatory-permissive' dichotomy. The latter deals with deciding whether a statute is one which a public official is obligated to follow, or one which he has discretion to disregard. It is not being asserted here that the procedures set out in section 1611, subdivision (a) are procedures the lower court had discretion to ignore. What is being asserted is that many statutory provisions which are mandatory in the obligatory sense are accorded only directory effect (*People* v. *McGee, supra,* 19 Cal.3d at p. 959.), and if this court gives subdivision (a) a 'directory' effect that finding would not be inconsistent with settled law." (*People* v. *Mord, supra,* 197 Cal.App.3d at p. 1114.)

[11] With respect to the *Mord* decision, the dissent says only that it is badly reasoned and involved a different statute. In our view, section 1606, involved here, and former section 1611, subdivision (a), involved in *Mord,* are virtually indistinguishable for purposes of the analysis here. Both require that the court hold annual hearings to review the status of defendants on outpatient treatment and that, following the hearing, the court shall discharge the defendant, continue outpatient status or order the defendant reconfined. Subdivision (b) of former section 1611, referred to by the dissent, has no relevance to the portion of *Mord* upon which we rely.

[12] The dissent contends that our holding will render the statute unenforceable. While this suggestion may have some theoretical appeal, the practicalities of the matter dictate otherwise. While we in no way condone the state authorities' abdication of responsibility to comply with the statutory requirements, we note that appellant at any time could have requested that a review hearing be held. Had he unsuccessfully requested such, it appears that mandamus would be available to compel compliance with the statutory procedures. (Compare *People* v. *Wymer, supra,* 192 Cal.App.3d at p. 514 [by mandamus or habeas corpus, a confined MDSO can petition for review of the failure of the hospital director and program director to exercise their discretion concerning his readiness for outpatient status].)

The dissent also contends that this is an easier case in which to accord a statute mandatory effect than *People* v. *McGee, supra,* 19 Cal.3d 948, where the Supreme Court held mandatory a provision that restitution be sought prior to bringing a criminal action for welfare fraud. This is so, it is asserted, because the benefit conferred by the statute on appellant here is greater than that conferred on the defendants in *McGee.* What the dissent overlooks is the drastically different consequences flowing from a holding of mandatory effect in *McGee* and in the present case. The consequence in *McGee* was that the defendants were not prosecuted for the economic crime of fraudulently obtaining $266.93 in welfare benefits. (19 Cal.3d at pp. 957, 968-969.) The consequence here would be that a convicted child molester who might

treatment needed.[13] We do not share the dissent's cynical view that our holding will lead to increased failures of the responsible government officials to comply with the annual review requirements. It appears to us very likely that appellant here simply "fell through the cracks." We are confident that publication of this opinion will increase the awareness of such officials of their duties and lead to increased compliance with the statutory requirements.

Lastly, we consider appellant's contention that he has been denied due process of law. He relies by analogy upon cases refusing to extend commitments under other statutory schemes of prisoners *in confinement*. Several courts have refused to permit the extension, pursuant to section 1026.5, of the commitment to a state hospital of a prisoner found not guilty by reason of insanity when there has been a serious delay in filing the petition for such extension. Under that section the petition must be filed no later than 90 days before expiration of the original commitment. These courts have reasoned that the time limit was "jurisdictional" or that the defendant was denied due process by being afforded inadequate time to prepare his defense in a proceeding which could result in his loss of liberty. (See *People* v. *Pacini* (1981) 120 Cal.App.3d 877, 891-892 [174 Cal.Rptr. 820]; *People* v. *Hill* (1982) 134 Cal.App.3d 1055 [185 Cal.Rptr. 64]; *People* v. *Saville* (1982) 138 Cal.App.3d 970, 974 [188 Cal.Rptr. 376]; *People* v. *Hawkins* (1983) 139 Cal.App.3d 984, 987 [189 Cal.Rptr. 126]; *People* v. *Dougherty* (1983) 143 Cal.App.3d 245, 248-249 [191 Cal.Rptr. 668].) Similarly, in *People* v. *Hernandez* (1983) 148 Cal.App.3d 560 [196 Cal.Rptr. 31], the court refused to extend the defendant's detention by the California Youth Authority when the application for extension was filed 17 days before expiration of the commitment rather than 90 days before as required by Welfare and Institutions Code section 1800.

We find these cases distinguishable in that they involved situations where the defendants were in actual confinement and the state was taking affirmative steps to extend the confinement. Here appellant was not in

---

still be in need of treatment would automatically be released from any supervision and treatment which the state could require.

[13] The dissent asserts that there is no evidence that the appellant was a danger to others or in need of treatment, pointing out that at the hearing on the motion for discharge from outpatient status the People argued only as to the heinous nature of the crimes. Whether appellant was dangerous or in need of treatment was not, however, the issue at that hearing. The sole issue was whether he should *automatically* be discharged from outpatient status due to the violation of the procedural requirements of section 1606. Thereafter, on April 1, 1988, the court held a hearing after receiving a report from Community Mental Health. Although that report is not part of the record before us, it apparently recommended that appellant was in need of further treatment, as the court then entered an order continuing his outpatient status for an additional year.

confinement and as long as no review occurred that status quo remained. ■ As the court observed in *People v. Hernandez, supra,* 148 Cal.App.3d at page 564, "as the significance of the interest involved increases, so does the level of procedural protection required by due process. [Citations.]." ■ Appellant's interest in having a hearing which he never requested and which could have resulted in revocation as well as continuance or discharge of outpatient status is not as significant as the interests of confined prisoners in defending a proceeding in which the state is attempting to extend their confinement.

The order denying appellant's motion for discharge from outpatient status is affirmed.

Peterson, J., concurred.

**KLINE, P. J.**—I respectfully dissent. The majority concludes that the annual review provisions of Penal Code section 1606[1] are directory rather than mandatory because it believes this result will best accomplish the purpose of public protection and assure that appellant receives the treatment he assertedly needs. This conclusion is based not only on a superficial analysis of the law pertaining to whether a duty is mandatory or directory, but upon the dubious assumption that the primary purpose of section 1606 is public protection and the mischaracterization of appellant as a dangerous person in need of treatment.

### I.

The majority opinion is replete with suggestions that appellant must be considered a mentally disordered sex offender "predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." (Welf. & Inst. Code, § 6300.) This inference cannot be supported either on the law or the facts of this case. More than six years ago, after a hearing at which a district attorney participated, a superior court judge found that appellant "will not be a danger to the health and safety of others while on outpatient status" (§ 1602) and authorized appellant's release to society. There is not a scintilla of evidence that since that time appellant has in any way shown himself to be dangerous to others. The district attorney never made such a claim during the proceedings below and at oral argument in this court the Attorney General expressly conceded that appellant has not presented a danger to society while he has been on outpatient status.

---

[1] All statutory references are to the Penal Code except where otherwise indicated.

The record does not satisfactorily explain the People's very belated effort to renew appellant's outpatient status. The sole reason not to discharge appellant that was provided the trial court by the prosecutor was "the heinous nature of the crime" he committed a decade earlier. The statutes dealing with the outpatient status of mentally disordered sex offenders (§§ 1600-1620) clearly do not contemplate nor should the courts countenance the misuse of outpatient status for this punitive purpose.

The majority's assumption that the chief purpose of section 1606 is public protection seems to me very questionable. Although I agree there may be a public safety aspect to that statute, that is not its main purpose. As just indicated, a mentally disordered sex offender may not be released from confinement and made an outpatient if there is any discernible likelihood he is still dangerous. Even if the person was found incompetent on a misdemeanor or felony charge that did *not* involve violence, or was found not guilty of any such offense by reason of insanity, he may be made an outpatient only if three conditions are all satisfied: (1) the director of the treatment facility to which he has been committed "advises the court that the defendant will not be a danger to the health and safety of others while on outpatient status, and will benefit from such outpatient status"; (2) the "community program director" familiar with the defendant also "advises the court that the defendant will not be a danger to the health and safety of others while on outpatient status"; and (3) that "[a]fter actual notice to the prosecutor and defense counsel, and after a hearing in court, the court specifically approves the recommendation and plan for outpatient status." (§ 1602, subd. (a).) If the person was found incompetent on a charge of any violent felony or was found not guilty by reason of insanity of such a violent offense[2] the requirements that must be satisfied before he can be placed on outpatient status are even more stringent. (§ 1603.) In other words, before a mentally disordered offender may be placed on outpatient status, state mental health officials must be willing to certify to the prosecutor and to the court that the offender is no longer a danger to others, and a superior court judge must be persuaded that release from confinement will "cause no undue hazard to the community." (*People* v. *Wymer* (1987) 192 Cal.App.3d 508, 513 [237 Cal.Rptr 301].) Thus the outpatients to whom the one-year termination and annual review requirements apply have been subjected to

---

[2] Section 1601, subdivision (a) defines such offenses as "murder, mayhem, a violation of Section 207 or 209 in which the victim suffers intentionally inflicted great bodily injury, robbery with a deadly or dangerous weapon or in which the victim suffers great bodily injury, a violation of subdivision (a) or (b) of Section 451, a violation of subdivision 2 or 3 of Section 261, a violation of Section 459 in the first degree, a violation of Section 220 in which the victim suffers great bodily injury, a violation of Section 288, a violation of Section 12303.1, 12303.2, 12303.3, 12308, 12309, or 12310, or any felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person . . . ."

and passed a far more rigorous test of dangerousness than is applied to most others walking about in society these days.

It is also important to understand that section 1606 has nothing to do with the situation in which an individual becomes dangerous while on outpatient status and for that reason the responsible authorities want to return him to confinement. The "revocation of outpatient status," which may be sought when the person "requires extended inpatient treatment or refuses to accept further outpatient treatment" is governed by section 1608. The situation in which an outpatient becomes dangerous is governed by section 1609, which provides that "[i]f at any time during the outpatient period . . . the prosecutor is of the opinion that the person is a danger to the health and safety of others while on that status, the prosecutor may petition the court for a hearing to determine whether the person shall be continued on that status. . . . If, after a hearing in court conducted using the same standards used in conducting probation revocation hearings . . . the judge determines that the person is a danger to the health and safety of others, the court shall order that the person be confined in a state hospital or other treatment facility . . . ." As indicated, the People have never invoked this procedure against appellant nor otherwise presented any evidence that he is dangerous or that he is in need of any particular medical treatment.

The majority derides my conclusion that public safety is not the primary purpose of section 1606 because outpatient status includes "an appropriate program of supervision and treatment" identified by the community program director. (§ 1602, subd. (a)(2).) Thus, my colleagues reason, "To say that it has been determined that a defendant, previously found to be 'predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others' (former Welf. & Inst. Code, § 6300), will not be a danger while receiving supervision and treatment is certainly not to say that he will not be a danger under any circumstances, regardless of treatment." (Maj. opn., *ante,* p. 1407.) This conclusion cannot be justified either by the facts of this case or the statutory scheme.

There is absolutely nothing in the record which suggests that appellant has ever received "supervision and treatment." On the contrary, as already pointed out, *the record establishes that appellant has been totally ignored for at least five years, and that the state would not even now be paying him any attention had he not insisted upon it by commencing this litigation.* The state has never claimed that appellant is dangerous or needs any particular "treatment" and there is no indication in the record that he is even now receiving any.

The majority's legal theory, which was never advanced by the district attorney at trial or by the Attorney General here, is also hard to square with common sense. It is commonly understood that the very nature of an individual's status as an outpatient places him beyond the day-to-day control of medical or law enforcement authorities. For this reason no superior court judge in his right mind would release to outpatient status a sexual offender previously found to be "dangerous to the health and safety of others" on the theory that, because of the "supervision and treatment" he is supposed to receive, he will no longer be dangerous to others. A mentally disordered sex offender (MDSO) who advanced this theory to obtain his release would almost certainly receive short shrift. The theory is no more persuasive in the hands of my colleagues. Clearly, when the Legislature declared that an MDSO could be returned to society only when the court is assured by the responsible medical authority that he "will not be a danger to the health and safety of others while on outpatient status" it did not have in mind the conditional assurance the majority postulates.

In short, the statutory scheme regarding outpatient status for mentally disordered sex offenders relies primarily upon other provisions, not the annual review requirement of section 1606, to protect the public. Section 1606 is based on the eminently reasonable assumption that superior court judges will allow the release to outpatient status only of those MDSO's who are no longer deemed dangerous to others. The purpose of the annual review requirement is primarily to protect outpatients from precisely the sort of bureaucratic indifference appellant has experienced. In effect, section 1606 means that outpatient status, which ordinarily serves as a community-based transition to complete discharge, shall terminate after one year unless, in accord with the procedures described in the statute, the responsible public officials show and the court agrees there is a reason such intermediate status should be renewed for another one-year period or the person be confined in a treatment facility.

Though it seems to me that section 1606 was not chiefly designed to protect the public, it deserves to be emphasized that the annual review requirement should be deemed mandatory *even if I am entirely wrong in this regard and my colleagues are correct.*

The majority holds "that the annual review provisions of section 1606 are directory since the primary purpose of the statutory scheme is protection of society and a holding that the review provisions are mandatory would defeat that purpose by automatically releasing appellant, a child molester who was found mentally disordered, from any further supervision or treatment without a court's determination that he is no longer in need of such supervision or treatment." (Maj. opn., *ante,* p. 1406.) Ignoring for the

moment the majority's false characterization of appellant as a present danger to society, and putting aside as well the majority's baffling indifference to the fact that so far as we know he has never been and is not now being provided supervision or treatment, the majority's holding is paradoxical. If noncompliance with the annual review requirement does not result in the invalidation of the governmental action to which it relates (which is what it means to call the requirement directory), the responsible government officials will inevitably perceive a diminished need to strictly comply with that responsibility. Thus, in order to protect society from appellant, who ironically presents no danger, the court weakens the statutory requirement it claims is essential to protect the public from persons who may be truly dangerous. This would be contrary to the law, not just common sense. As later explained in greater detail (see discussion, *post,* at pp. 1419-1420), the statutes that are invariably given mandatory effect are those designed to protect the public. "A statutory provision would generally be regarded as mandatory where the power or duty to which it relates is for the public benefit, good, interest or protection; it can also be for the security of public rights or for the advancement of public justice." (2A Sutherland, Statutory Construction (4th ed. 1972) § 57.02, p. 641, fn. omitted.) In short, the force of my argument that the annual review requirement imposes a mandatory duty is undiminished if the majority is correct that the requirement is essential to protect society against MDSO's.

## II.

The central question presented by this case is whether the statutory declaration that the period of outpatient status ordinarily is "not to exceed one year" (§ 1606) and that it must therefore be annually reviewed should be accorded "mandatory" or "directory" effect. The seminal California cases indicate that the legislative intent as to whether a particular provision is mandatory or directory "must be gathered [1] from the terms of the statute construed as a whole, [2] from the nature and character of the act to be done, and [3] from the consequences which would follow the doing or failure to do the particular act at the required time." (*Pulcifer* v. *County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1]; *East Bay Municipal Utility Dist.* v. *Garrison* (1923) 191 Cal. 680, 686 [218 P. 43].) Objectively considered, all three factors support the conclusion that the annual review provision of section 1606 imposes a mandatory duty. Accordingly, the failure to discharge that duty invalidates the challenged governmental action.

### 1.

It is correct, as the majority points out, that the mandatory-directory dichotomy is analytically different from the obligatory-permissive distinc-

tion. "[T]he 'directory' or 'mandatory' designation does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory,' but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]"[3] (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606]; *People* v. *McGee* (1977) 19 Cal.3d 948, 959 [140 Cal.Rptr. 657, 568 P.2d 382].) Thus, the use of an obligatory word, such as "shall" or "must" is not dispositive of a legislative intent to impose a mandatory duty. This does not mean, however, that the use of obligatory or permissive language is irrelevant to the inquiry whether a duty is mandatory or directory. A procedural step is ordinarily not deemed mandatory—in the sense that failure to comply will have the effect of invalidating the governmental action to which the requirement applies—unless the duty is expressed in obligatory terms, though there are a surprising number of situations in which the use of a permissive term is nonetheless held consistent with the imposition of a mandatory duty. (See, 1A Sutherland, *supra,* § 25.04, pp. 445-446, and cases there cited ["Even the permissive word 'may' is interpreted as mandatory when the duty is imposed upon a public official and his act is for the benefit of a private individual"]; accord *Mason* v. *Fearson* (1850) 50 U.S. (9 How.) 248, 258 [13 L.Ed. 125, 130] [" 'Where a statute directs the doing of a thing for the sake of justice or the public good, the word "may" is the same as the word "shall." ' "].) *Pulcifer, McGee,* and the most authoritative treatises all indicate that whether a statute should be given mandatory effect depends largely on the intent of the legislature. "[The] distinction [between directory and mandatory statutes] grows out of the fundamental difference in the intention of the legislature in enacting the two statutes. Although directory provisions are not intended by the legislature to be disregarded, the seriousness of noncompliance is not considered so great that liability automatically attaches for failure to comply. . . . If the legislature considers the provisions sufficiently important that exact compliance is required then the provision is mandatory." (1A Sutherland, *supra,* § 25.03, p. 441.) Because the best indications of the legislature's in-

---

[3] As Justice Tobriner has pointed out, "courts have not always been careful to confine the use of the 'directory-mandatory' terminology to its proper context, and have sometimes referred to the doctrine in cases in which it was completely inapposite." (*Morris* v. *County of Marin, supra,* fn. 4, at p. 909.) Unfortunately, the courts are not the only authorities that are sometimes confused in this area. See, e.g., 2A Sutherland, *supra,* section 57.14, footnote 1, citing *Uhl* v. *Badaracco* (1926) 199 Cal. 270 [248 P. 917]; *Harless* v. *Carter* (1954) 42 Cal.2d 352 [267 P.2d 4]; *Mass* v. *Board of Education* (1964) 61 Cal.2d 612 [39 Cal.Rptr. 739, 394 P.2d 579]; and *Kevelin* v. *Jordan* (1964) 62 Cal.2d 82 [41 Cal.Rptr. 169, 396 P.2d 585], for the proposition that statutes providing for the performance of acts by public officials protecting private rights or the public interest are deemed mandatory. Though the principle is correct, the cited California cases, which do not genuinely present the question whether government action is invalid because of the failure to comply with a mandatory duty, are inapposite.

tent are the words it employed, "[t]he form of the verb used in the statute, i.e., something 'may,' 'shall' or 'must' be done, is the single most important textual consideration determining whether a statute is mandatory or directory." (2A Sutherland, *supra,* § 57.03, p. 643.) Thus, "[w]hile 'shall' has been validly interpreted as directory [citation] it is usually presumed mandatory and has been interpreted as such previously in this and other jurisdictions. [Citations.]" (*Bd. of Educ. of Granite Sch.* v. *Salt Lake Cty.* (Utah 1983) 659 P.2d 1030, 1035.)

The use in section 1606 of the word "shall," not once or twice but *seven times,* therefore cannot be ignored,[4] particularly in contrast with the use of the permissive "may" elsewhere throughout the statutory scheme. (§§ 1600-1620.) Such use of the verbs "shall" and "may" in close juxtaposition, which indicates that a different meaning was attached to each, is clearly relevant to the question whether a statute should be given mandatory or directory effect. (2A Sutherland, *supra,* § 57.11, p. 665, and cases there cited.)

The use of the obligatory "shall" is particularly important in this case because the provision in which it appears is a penal statute. As stated in *People* v. *Johnson* (1955) 134 Cal.App.2d 140 [285 P.2d 74], "[i]t is true that the word 'shall' when appearing in a statute is not necessarily mandatory, and may be construed as directory or permissive, depending upon the intent of the Legislature. [Citations.] But it is also true that 'When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted.' [Citations.]" (*Id.,* at p. 144.)[5] Because the Legislature must be deemed

---

[4] Penal Code section 1606 provides in its entirety as follows: "Outpatient status *shall* be for *a period not to exceed one year. At the end of the period of outpatient status approved by the* court, the court *shall,* after actual notice to the prosecutor, the defense counsel, and the community program director, and after a hearing in court, either discharge the person from commitment under appropriate provisions of the law, order the person confined to a treatment facility, or renew its approval of outpatient status. Prior to such hearing, the community program director *shall* furnish a report and recommendation to the medical director of the state hospital, where appropriate, and to the court, which the court *shall* make available to the prosecutor and defense counsel. The person *shall* remain on outpatient status until the court renders its decision unless hospitalized under other provision of the law. The hearing pursuant to the provisions of this section *shall* be held no later than 30 days after the end of the one-year period of outpatient status unless good cause exists. The court *shall* transmit a copy of its order to the community program director or a designee." (Italics added.)

[5] *People* v. *Johnson, supra,* it must be acknowledged, is among the legion of cases using the terms "mandatory" and "directory" simply as synonyms for "obligatory" and "permissive" and therefore out of the doctrinal context in which the words are employed in this opinion. Nevertheless, because it addresses the intent of the Legislature, the rationale of *Johnson* is relevant to the question whether the failure to comply with a legislative prescription set forth in a penal statute should be invalidated pursuant to the mandatory-directory analysis with which we are here engaged. As pointed out in *People* v. *McGee, supra,* 19 Cal.3d 948,

aware of this fundamental rule of statutory construction, the use of "shall" in a penal statute like section 1606, which imposes a duty on the state and may reasonably be construed in favor of the offender, must be deemed evidence of a legislative intention that the provision be given mandatory effect.

Aside from the repeated use of the word "shall," the clearest textual indication that the annual review requirement of section 1606 is mandatory rather than directory is the first sentence: "Outpatient status shall be for a period *not to exceed one year.*" (Italics added.) "One of the strongest indications of what construction should be given a statutory provision may be found in the use of negative, prohibitory, or exclusionary words. Where statutory restrictions are couched in negative terms they are usually held to be mandatory. In the language of one court 'there is but one way to obey the command "thou shalt not," and that is to refrain altogether from doing the forbidden act.'" (2A Sutherland, *supra,* § 57.09, p. 661, fns. omitted, citing *Gomez* v. *Timon* (1910) 60 Tex.Civ.App. 311 [128 S.W. 656].) Thus in *Pulcifer* our Supreme Court acknowledged that while time provisions are often held directory[6] "they will be considered mandatory if the language contains negative words" or otherwise "shows that the designation of the time was intended as a limitation of power, authority or right." (*Pulcifer* v. *County of Alameda, supra,* 29 Cal.2d at p. 262; *People* v. *Lake County* (1867) 33 Cal. 487, 492.) Statutes or regulations similar to that before us providing that an administrative agency "shall act" "not later than" a specified period are consistently deemed mandatory rather than directory because "[t]he use of the word 'shall' in conjunction with the phrase 'not later than' is clearly indicative of a mandatory declaration. (See *Cake* v. *Los Angeles* 1913] 164 Cal. 705, 709-710 . . .; *City of Oakland* v. *Burns* [1956] 46 Cal.2d 401, 406 . . . ; *Steele* v. *Bartlett* [1941] 18 Cal.2d 573, 574 . . . .) [¶] Accordingly, where a statute absolutely fixes the time within which an act is to be done it is peremptory and the act cannot be done at any other time unless during the existence of the prescribed time the time has been extended by an order made for that purpose under authority of law. [Citations.]" (*Ursino* v. *Superior Court* (1974) 39 Cal.App.3d 611, 619 [114

"[a]lthough the mandatory-directory and obligatory-permissive dichotomies are . . . analytically distinct, in some instances there is an obvious relationship between the two." (*Id.,* at p. 959.)

[6] "In the context of a time period specified in terms of 'shall' or its equivalent for the commencement of administrative action, the word has been held to be a mandatory limitation upon the power to act upon an appeal relating to a building permit (*Ursino* v. *Superior Court* [1974] 39 Cal.App.3d 611, 619 . . . ), and to administrative action on appeals from county decisions reducing or terminating aid (*King* v. *Martin* [1971] 21 Cal.App.3d 791 . . . .)" (*Governing Board* v. *Felt* (1976) 55 Cal.App.3d 156, 162 [127 Cal.Rptr. 381], holding that the statutory command that a hearing on an accusation against a teacher must commence within 60 days of the teacher's demand is mandatory. (*Id.,* at p. 163.)

Cal.Rptr. 404].) The language of section 1606 thus clearly indicates the annual review requirement was intended to have mandatory rather than directory effect.

2.

"The nature and character of the act to be done," the second of the three considerations identified in *Pulcifer,* compels the conclusion that section 1606 imposes a mandatory duty entirely apart from the language the Legislature employed.

It is significant that section 1606 imposes duties on public officials, i.e., the State Department of Mental Health or community program directors designated by the department for the benefit of outpatients and the public. (§ 1605.) As earlier pointed out, statutes such as this, which specify the performance of acts or the exercise of power by government officials for the protection of private rights or the public interest are invariably mandatory, *and this is so even if they are expressed in permissive terms.* As earlier noted, "[w]here statutes provide for performance of acts or the exercise of power or authority by public officers protecting private rights or in public interest, they are mandatory. This is true irrespective of whether they are phrased in imperative or permissive terms." (2A Sutherland, *supra,* § 57.14, p. 671, fn. omitted, see also § 57.02, at p. 641.) The early case of *French* v. *Edwards* (1872) 80 U.S. 506 [20 L.Ed. 702] is illustrative of the rule. That case involved a California statute providing that the sheriff, in selling property upon a judgment recovered by the state against the property for delinquent taxes, " 'shall only sell the smallest quantity that any purchaser will take and pay the judgments and all costs.' " (*Id.,* at p. 508 [20 L.Ed. at p. 703], italics omitted.) The plaintiff, who originally owned the property in question, sued defendants who acquired the premises under a deed executed by the sheriff of Sacramento County upon a sale on a judgment for unpaid taxes. The critical fact was that the tax deed did not show compliance with the statute, i.e., "that the smallest quantity of the property was sold for which the purchaser would pay the judgment and costs, or that any less than the whole property was ever offered to bidders, or that any opportunity was afforded them to take any less than the entire tract and pay the judgments and costs." (*Id.,* at p. 509 [20 L.Ed. at p. 703].) The rationale of the court's determination that the tax sale was invalid because the statute imposed a mandatory duty is succinctly set forth in the opening paragraph of Justice Stephen J. Field's opinion for the court: "There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system and dispatch in proceedings,

and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated. *But when the requisitions prescribed are intended for the protection of the citizen, and to prevent a sacrifice of his property, and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory. They must be followed or the acts done will be invalid. The power of the officer in all such cases is limited by the manner and conditions prescribed for its exercise.* " (*Id.,* at p. 511 [20 L.Ed. at p. 703], italics added.)

The foregoing statement of the rule, which is still good law, has even been applied when the Legislature used the seemingly permissive "may" rather than the obligatory "shall." (See, e.g., *Mason* v. *Fearson, supra,* 50 U.S. 248 at p. 258 [13 L.Ed. at p. 130] [" 'Where a statute directs the doing of a thing for the sake of justice or the public good, the word "may" is the same as the word "shall." ' "]; *Ventura County* v. *Clay* (1896) 112 Cal. 65, 70 [44 P. 488]; *County of Fresno* v. *Canal Co.* (1886) 68 Cal. 359, 361 [9 P. 309]; *Anthony A. Bianco, Inc.* v. *Hess* (1959) 86 Ariz. 14 [339 P.2d 1038, 1045]; *State* v. *Greenbaum* (1948) 83 Ohio App. 484 [84 N.E.2d 253, 256] [" ' "the word 'may' should be construed to be mandatory whenever the public or individuals have a claim de jure that the power conferred should be exercised, or whenever something is directed to be done for the sake of justice or the public good." ' "]; 52 Cal.Jur.3d, Public Officers, § 171, p. 334.)

The instant case, which involves a statute that uses obligatory, not permissive, language, is therefore an easier one in which to accord mandatory effect than the cases just cited. This is also an easier case than *People* v. *McGee, supra,* 19 Cal.3d 948, the last case in which our Supreme Court has directly addressed the mandatory-directory distinction. The court held in *McGee* that Welfare and Institutions Code section 11483, prescribing criminal penalties for those who fraudulently obtain welfare benefits and incorporating by reference a statutory requirement that restitution "shall" be sought prior to the bringing of a criminal action, was intended to provide protection for individuals accused of welfare fraud, was to be accorded mandatory effect and, thus, that the failure to first seek restitution constituted a basis upon which to reverse a criminal conviction.

The restitution requirement described in *McGee* is not nearly as obviously beneficial to a person who has committed welfare fraud[7] as is the annual

---

[7] The *McGee* court appears to have concluded that the benefit of the restitution provision to a person guilty of welfare fraud is that restitution might influence the district attorney not to commence criminal proceedings. (19 Cal.3d at p. 960.) The court acknowledged, however,

review requirement beneficial to a person on outpatient status. The benefit conferred on such a person is the right to termination of outpatient status and discharge after one year unless, upon a sufficient factual showing by responsible government officials, a court orders either that such status be renewed or the person be transferred to a treatment facility. The termination of outpatient status frees the former patient of state supervision, eliminates the threat of revocation and reinstitutionalization (see §§ 1608, 1609), and permits the person to travel freely to other states without the approval of the prosecutor and the committing court. (§ 1611.) The right created by the annual review requirement exists only as a result of section 1606. "A statute granting a new right is mandatory; and a right which exists only by virtue of statutory grant comes into being only after strict compliance with the statute and all of its conditions." (2A Sutherland, *supra,* § 57.18, p. 681., fn. omitted.)

My colleagues' different view of section 1606 results in large part from their unjustified reliance on the opinion in *People* v. *Mord* (1988) 197 Cal.App.3d 1090 [243 Cal.Rptr. 403], which is not only badly reasoned but involved a different statute. The *Mord* court found that "the primary purpose" of annual review hearings prescribed under former Penal Code section 1611 for mentally disordered sex offenders on "parole" from a state mental health facility "is not to protect [a parolee's] individual interests, but to protect the public's interest in ensuring that insane persons receive the treatment they need." (*Id.,* at p. 1114.) On this basis, the court concluded that holding the statute to be directory "will not only best accomplish the purpose of public protection, but will best benefit appellant as well. . . . A holding by this court that the statute violated is a 'mandatory' one, thereby voiding the subsequent recommitment order and releasing appellant into the community, not only exposes the public to a dangerous person but prevents appellant from receiving treatment for his illness." (*Ibid.*) The statute referred to in *Mord,* which has since been repealed, was different from the statute we are construing in the present case in one critical particular. Subdivision (b) of former section 1611 (which is set forth in *Mord* at p. 1109) contains provisions analogous to those now appearing in section 1608, dealing with the revocation of outpatient status. Thus, the statute construed in *Mord* contained provisions calculated to protect the public that have no counterpart in the statute we are here construing. In any event, as I have already pointed out, the conclusion of the *Mord* court, like that of my colleagues here, is a non sequitur. If the main purpose of the statute is public protection, as the majority claims, rendering it directory rather than mandatory will endanger, not protect, society. To the extent that such a

that language which would have rendered restitution a complete defense to criminal charges was deleted from the statute during the legislative process. (*Ibid.*)

result might occasionally operate to discharge outpatients like appellant, it must be kept in mind that such persons have been judicially determined to be nondangerous.

The majority relies upon *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373], and *In re Bevill* (1968) 68 Cal.2d 854 [69 Cal.Rptr. 599, 442 P.2d 679] for the proposition that protection of society is the primary purpose of the MDSO law. This is not, however, what the two cases say. In *Feagley* the court declared that the mentally disordered sex offender law is designed both to protect society and treat offenders, "and although *confinement* thereunder is not 'solely' for the protection of society, that is nevertheless its 'primary purpose' . . . ." (*Feagley, supra,* 14 Cal.3d at p. 361, italics added.) Similarly, in *Bevill* the court stated that "[t]he primary purpose of *quarantining* mentally disordered sex offenders is protection of the public . . . ." (*Bevill, supra,* 68 Cal.2d at p. 860, italics added.) The state released appellant from confinement nearly six years prior to the commencement of this proceeding, when it persuaded a superior court judge that he was no longer dangerous, and has never sought to reconfine him.

3.

The last of the three factors that must be considered in determining whether the annual review requirement is mandatory or directory is "the consequences which would follow the doing or failure to do the particular act at the required time." (*Pulcifer* v. *County of Alameda, supra,* 29 Cal.2d at p. 262.)

The consequence that would result from holding the one-year termination and annual review requirements of section 1606 merely directory is precisely the one the courts most assiduously avoid: the rendering of the statute unenforceable. " 'Whether a statutory requirement is mandatory or directory depends on its effect. If no substantial rights depend on it and no injury can result from ignoring it, and the purpose of the legislature can be accomplished in a manner other than that prescribed and substantially the same results obtained, then the statute will generally be regarded as directory; but, if not, it will be mandatory.' " (2A Sutherland, *supra,* § 57.07, p. 656, quoting *Miller* v. *Lakewood Housing Co.* (1932) 125 Ohio St. 152 [180 N.E. 700, 81 A.L.R. 1239].)

The consequence of characterizing the annual review requirement directory is to deprive persons who have been adjudicated "not [to] be a danger to the health and safety of others" of an enforceable right to termination of outpatient status and the constraints it imposes after satisfactorily complet-

ing one year as an outpatient. The majority has therefore undermined the idea, central to the statutory scheme, that a person who has met all the stringent requirements of section 1602 and been found by a judge to no longer pose any danger to society shall ordinarily be entitled to freedom from further state control after serving as an outpatient "for a period not to exceed one year," with the burden on the state to annually demonstrate a need to depart from this norm. My colleagues have thus supplied the Department of Mental Health and its designees a convenient means of keeping persons adjudicated to be no danger to others on outpatient status indefinitely without having to annually account to the court, as the Legislature clearly intended.

Indeed, by effectively rendering the annual review requirement judicially unenforceable, the majority has also relieved the department of the legal pressure to provide the "supervision and treatment" my colleagues claim is essential to protect the public. Thus, as I have earlier explained, the majority opinion subverts the public safety purpose it ascribes to the statute. The fact that there is no available alternative method of insuring that the department properly supervises and treats persons on outpatient status is yet another reason the annual review requirement should be deemed mandatory rather than directory. (*Morris* v. *County of Marin, supra,* 18 Cal.3d at pp. 908-909, fn. 4; *Palmer* v. *City of Ojai* (1986) 178 Cal.App.3d 280, 293 [223 Cal.Rptr. 542].)

Finally, the fact that appellant is not confined is analytically irrelevant to the question whether the duties imposed by section 1606 are mandatory or directory. *People* v. *Hernandez* (1983) 148 Cal.App.3d 560 [196 Cal.Rptr. 31], the sole authority the majority relies upon in this regard, is a due process case that is in this connection wholly inapposite. Moreover, though the fact appellant is not confined is irrelevant it bears noting that his outpatient status imposes significant burdens. Not only may his freedom be judicially revoked on the recommendation of a community program director or a district attorney based on the same low level of proof used in probation revocation hearings (§§ 1608, 1609), but he may be criminally punished for leaving the state without notice to the prosecutor and the written approval of the superior court. (§ 1611.)

### 4.

Although, for the foregoing reasons, I do not think it should be necessary to reach the constitutional issue appellant tenders (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1]), the majority cannot avoid it. The majority's rejection of the due process claim does not, in my view, stand up to scrutiny.

My colleagues acknowledge that there are many cases in which courts have on due process grounds refused to extend commitments under statutory schemes similar to that involved in this case because a public official delayed the filing of the necessary petition. (See, e.g., *People* v. *Hernandez, supra,* 148 Cal.App.3d 560; *People* v. *Dougherty* (1983) 143 Cal.App.3d 245 [191 Cal.Rptr. 668]; *People* v. *Hawkins* (1983) 139 Cal.App.3d 984 [189 Cal.Rptr. 126]; *People* v. *Saville* (1982) 138 Cal.App.3d 970 [188 Cal.Rptr. 376]; *People* v. *Hill* (1982) 134 Cal.App.3d 1055 [185 Cal.Rptr. 64]; *People* v. *Pacini* (1981) 120 Cal.App.3d 877 [174 Cal.Rptr. 820].) *Hernandez* and *Dougherty,* the two most recent cases, are illustrative. In *Hernandez* the trial court entered an order continuing a defendant's detention for treatment by the Youth Authority after finding that if he were released he would be physically dangerous to the public. The Court of Appeal reversed, holding that because the application to extend the defendant's commitment was filed only 17 days before his normal discharge date, and not 90 days before, as required by statute (Welf. & Inst. Code, § 1800), it was untimely and constituted a denial of due process in view of the absence of any reason for the delay and since the delay prevented adequate preparation by the defendant's counsel. (*Hernandez, supra,* 148 Cal.App.3d at p. 565.)

In *Dougherty* the trial court entered an order under section 1026.5 extending the commitment to a state hospital of an inmate found not guilty of a crime by reason of insanity (an order that can be made only on the basis of a finding that the inmate "represents a substantial danger of physical harm to others.") (§ 1026.5, subd. (b)(1).) The inmate's motions to dismiss the extended commitment proceedings for the delay in commencing the proceedings was denied. The Court of Appeal reversed, holding that a 66-day delay in filing the petition denied the inmate due process of law, since the delay had the prejudicial effect of depriving the inmate's counsel of an adequate time to prepare. The court rejected an affidavit from the responsible public official stating that his delay was due to " 'an unusual combination of procedural errors'" and was " 'wholly inadvertent and non-willful.'" This statement, the court observed, "says no more than that the delay was the result of negligence." (*People* v. *Dougherty, supra,* 143 Cal.App.3d at p. 249.)

The majority distinguishes *Hernandez, Dougherty* and the other cases on the grounds that, unlike the instant case, they involved persons who were in actual confinement and the state was taking steps to extend the confinement. (Maj. opn., *ante,* p. 1410.) This is not a persuasive basis upon which to distinguish otherwise controlling cases and deny appellant due process.

"The extent to which procedural due process must be afforded [an individual] is influenced by the extent to which he may be 'condemned to suffer

grievous loss,' [citation] and depends upon whether the [individual's] interest in avoiding that loss outweighs the governmental interest in summary adjudication." (*Goldberg* v. *Kelly* (1970) 397 U.S. 254, 262-263 [25 L.Ed.2d 287, 296, 90 S.Ct. 1011].) As our own Supreme Court has articulated this theme, "the greater the deprivation an individual will suffer . . . the greater the public urgency must be to justify the imposition of that loss . . . ." (*Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 558 [96 Cal.Rptr. 709, 488 P.2d 13].)

The majority employs the fact appellant is not under confinement only in connection with one side of the due process equation. Pointing out, correctly, that this diminishes the deprivation appellant will suffer, the majority refuses to acknowledge that it also diminishes the public urgency necessary to justify his loss. As already pointed out, the reason appellant is not confined is that the state, after persuading the committing court that he is no longer a danger to society, released him many years ago without ever showing that he was in need of supervision or treatment. Thus the governmental interest in this case is far less than that in *Hernandez, Dougherty* and the other due process cases appellant relies upon, where the individuals who sought (and gained) release represented a genuine threat to public safety.

The fact that outpatients are not confined does not deprive them of protections ordinarily reserved for important rights. Section 1606 hearings require the participation of a "prosecutor" and "defense counsel" at a judicial proceeding before a superior court judge, after notice to the outpatient of the report and recommendation of the community program director. The Legislature does not mandate elaborate proceedings of this sort except when significant rights are at stake. My colleagues' determination that the right to termination of outpatient status pursuant to section 1606 is not worthy of due process protection is thus hard to square with the Legislature's apparent assessment of that right.

Finally, the absence of justification for a delay in compliance with an important procedural right has provided a basis for finding a denial of due process of law, even where, as is not alleged here, the responsible administrative agency was suffering "enormous administrative burdens." (*People* v. *Hernandez, supra,* 148 Cal.App.3d at p. 565.) The People have offered no excuse or explanation for having failed to annually review appellant's outpatient status for five years. Neither have they provided any legally cognizable justification for refusing to discharge him from commitment in December of 1982, when he completed one year on outpatient status. If relatively trivial delays justified the release on due process grounds of unquestionably violent persons actually adjudicated physically dangerous to the public, why should not the same hold true when there has been an egregious and

unexplained five-year delay in the release from outpatient status of a person judicially found to constitute "no danger to the health and safety of others" (§ 1606)?

Because the duties described in section 1606 are mandatory rather than directory, and the failure of state mental health officials to discharge those duties has the effect of invalidating any attempt to otherwise extend outpatient status, I would reverse the judgment.

Appellant's petition for review by the Supreme Court was denied January 18, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.